**C.E.K. INDUSTRIAL MECHANICAL CONTRACTORS, INC., et al.,
Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Local Union No. 267 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO, Intervenor.**

No. 89–2008.

United States Court of Appeals,
First Circuit.

Heard Oct. 1, 1990.

Decided Dec. 17, 1990.

Carl H. Trieshmann, with whom Marcia A. Mahoney, Mark L. Keenan, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., Timothy W. Johnson and Crenshaw & Johnson, Atlanta, Ga., were on brief, for petitioners.

Laurence S. Zakson, Atty., Jerry M. Hunter, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Barbara A. Atkin, Supervisory Atty. and Judith P. Flower, N.L.R.B., Washington, D.C., were on brief, for respondent.

James L. LaVaute, with whom Blitman & King, Syracuse, N.Y., was on brief, for intervenor.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and WOODLOCK,* District Judge.

TORRUELLA, Circuit Judge.

The petitioners, C.E.K. Industrial Mechanical Contractors, Inc. ("CEK") and CAM–FUL Industries, Inc. ("Cam–Ful") (together, the "Companies") request this court to review the finding of the National Labor Relations Board ("Board") of unfair labor practices. The Board cross-petitions for enforcement of its order. The major issue presented is whether the Board's finding that the Companies violated the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.* ("NLRA"), by failing to apply the terms of a collective bargaining agreement to unit employees is supported by substantial evidence.[1] In order to resolve this point we must address several subsidiary issues: (1) whether CEK and Cam–Ful are alter egos; (2) whether the collective bargaining agreement between CEK (through an employers association) and the Union terminated or was automatically renewed; and (3) whether the Companies should be held retroactively to the Board's new position regarding the repudiation of § 8(f) prehire construction agreements.[2]

We also must determine whether substantial evidence supports the Board's finding that the Companies committed an unfair labor practice in failing to provide the Union with requested relevant information. Upon reviewing the facts and the relevant law, we conclude that although the Board's findings are supported by substantial evidence, under these circumstances, manifest injustice would result from the retroactive application of the Board's new § 8(f) repudiation policy. Therefore, for reasons expanded upon below, we decline to enforce the Board's order.

## I. FACTS

Robert Bradley incorporated Cam–Ful in November 1979, to engage in the real estate business. Bradley provided 75% of the

---

* Of the District of Massachusetts, sitting by designation.

1. The Board's decision is reported at 295 N.L.R.B. No. 70 (1989).

2. The Companies also raise the statute of limitations for unfair labor practice proceedings, 29 U.S.C. § 160(b), but we find that the Companies waived this affirmative defense by failing to raise it before the Board. 29 U.S.C. § 160(e); *Woelke and Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982).

financing for Cam–Ful and acted as its president; his partner Peter Nowyj provided the balance of the capital and held the title of secretary-treasurer. Both men were employed full-time with other companies. Cam–Ful was a week-end operation. Its primary function was preparing foreclosed-upon properties for resale; its activities included general construction, plumbing and janitorial services. Bradley and Nowyj performed most of the work themselves.

In April 1981, Bradley left his other job and incorporated CEK as a construction contractor specializing in plumbing. Bradley was always the sole owner of CEK, but because of local licensing requirements, CEK issued 51% of its stock to a licensed master plumber. After incorporating CEK, Bradley amended Cam–Ful's certificate of organization to provide that it had the purpose of performing construction work.

Bradley's goal in forming CEK was apparently to run it as a double-breasted operation, parallel with Cam–Ful, enabling him to bid on both union (via CEK) and non-union (via Cam–Ful) contracts.[3] Pursuant to this plan, in September 1981, Bradley signed, in the name of CEK, the collective bargaining agreement ("Agreement") between the Master Plumbing Association ("Association"), a multi-employer group, and Plumbers and Gasfitters Local 54 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry ("Union").[4] The Agreement was a prehire agreement of the type authorized for the construction industry by § 8(f) of the NLRA, 29 U.S.C. § 158(f). CEK did not become a member of the Association.

The Agreement ran from July 1, 1981, to June 30, 1983, and provided for a one-year automatic renewal unless either party gave 60 days written notice to the other of intent to terminate. Pursuant to this provision, in 1983 the Association gave timely notice of termination and requested renegotiation. In June 1983, the Association and the Union reached a new agreement. In July 1983, the Union invited contractors that had been signatory to the 1981–1983 Agreement, including CEK, to sign a memorandum adopting the new Agreement. In August, CEK replied to the Union, stating that it declined to adopt the new Agreement but was willing to engage in individual bargaining for a separate agreement.

In the meantime, the Union had become aware that Bradley was operating both a union and a non-union construction company. When contacted by the Union, Bradley denied the allegations. He later asserted that he was operating a legitimate double-breasted enterprise. The Union made several efforts to obtain more information from Bradley about the structure of the two companies, but these efforts generated only late and sketchy responses.

In the fall of 1983, Bradley decided to close down CEK. Its two remaining employees, both Union members, were transferred to Cam–Ful's payroll. CEK's equipment was divided between Bradley and Cam–Ful. Cam–Ful then completed the work which remained on projects begun by CEK. Cam–Ful has continued to operate as a construction contractor, handling some plumbing work.

## II. PROCEEDINGS BELOW

The Union filed an unfair labor practice charge based upon the Companies' failure to apply the terms of the CEK collective bargaining agreement with the Union to the workers performing plumbing work for Cam–Ful and upon Bradley's failure to provide the Union with the information it requested. The Board issued a complaint.

---

3. A double-breasted operation occurs when the same owner owns both a union and a non-union company. The non-union company bids on jobs that do not require a union contractor, while the union company bids on union jobs. Both companies can thus bid more competitively in their respective markets. Double-breasted operations in the construction industry are not inherently illegal under the NLRA. *A. Dariano & Sons, Inc. v. District Council of Painters No. 33*, 869 F.2d 514, 517 (9th Cir.1989).

4. Local 54, the original charging party, subsequently merged with other locals to become Local Union No. 267 of the Plumbers Union.

After a hearing, the administrative law judge ("ALJ") dismissed the complaint. He refused to find alter ego status as between CEK and Cam–Ful. Although there was no doubt that the Companies shared common ownership, and in fact constituted a single employer under the NLRA, the ALJ concluded that because of an absence of anti-union motive, and because Cam–Ful had pre-existed CEK, the Companies were not alter egos. These two facts, in his view, precluded a finding that Bradley had structured the Companies so that he could divert work from the union to the non-union operation. The ALJ also found that the Agreement between CEK and the Union had not been automatically renewed; rather, it had terminated when the Association gave notice to the Union. Finally, he found that no violation had occurred from Bradley's failure to provide the requested information.

The Board disagreed with the ALJ, finding that an alter ego relationship existed between Cam–Ful and CEK based on common ownership, financial management, and business purpose. The Board treated Cam–Ful's prior existence as nondeterminative, because after the creation of CEK, Cam–Ful's incorporation certificate was amended to allow it to perform work similar to that for which CEK was incorporated. Moreover, the nature of Cam–Ful's operations after the closing of CEK demonstrated the existence of an alter ego relationship. The Board also found that the contract had been automatically renewed because CEK itself had sent no termination notice; as a non-member which had not delegated its bargaining authority, CEK was not entitled to rely upon the notice sent by the Association. Based on these conclusions, the Board found that the Companies had committed unfair labor practices in violation of §§ 8(a)(1) and (5) of the NLRA, 29 U.S.C. §§ 158(a)(1), (5). Finally, the Board held that Bradley's failure to provide information violated § 8(a)(5) (bargaining in bad faith).

CEK and Cam–Ful have petitioned this court for review of the Board's Order. The Board has cross-petitioned for enforcement. The Union has intervened in support of the Board.

## III. DISCUSSION

Analysis of the Board's finding of unfair labor practices in this case requires assembly of a number of pieces. The heart of the unfair labor practice charge is that the Companies should have abided by the terms of the Agreement and applied those terms to the bargaining unit (plumbing) employees of both CEK and Cam–Ful. To reach this ultimate conclusion we would have to find that CEK and Cam–Ful should be treated as alter ego employers, that CEK continued to be bound by a valid collective bargaining agreement, and that the Companies' repudiation of the Agreement should not be allowed under the retroactive application of recent Board doctrine. We treat these issues in turn.

### A. *Were the Companies Alter Egos?*

 The concepts of single employer and alter ego employers are analytically distinct, *Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 24 (1st Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983), but both are used in dissecting the legality of a double-breasted operation. *A. Dariano & Sons, Inc. v. District Council of Painters No. 33,* 869 F.2d 514, 517 (9th Cir.1989). The single employer doctrine allows the Board to treat related enterprises as one employer within the meaning of § 2(2) of the NLRA, 29 U.S.C. § 152(2). *Carpenters Local Union No. 1846 v. Pratt–Farnsworth, Inc.,* 690 F.2d 489, 504 (5th Cir.1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). The doctrine is frequently used so that the Board can assert its jurisdiction over employers which, taken separately, would fall below the Board's self-imposed jurisdictional minimum. *E.g., Radio & Television Broadcast Technicians v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) (per curiam). A finding of single employer status does not mean that one business is bound by a union contract signed by another, absent an additional finding that the employees of each constitute a single ap-

propriate bargaining unit. *South Prairie Construction Co. v. Local 627, International Union of Operating Engineers*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976).

Alter ego analysis, on the other hand, is typically applied where an employer attempts to avoid its obligations under a collective bargaining agreement, and is particularly common in the context of successor employers, where the successor is "merely a disguised continuance of the old employer." *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106, 62 S.Ct. 452, 456, 86 L.Ed. 718 (1942). In this case, of course, the Board used the alter ego doctrine in a situation where the companies were not successors but rather parallel operations. There is Board precedent for this application. *See Z–BRO, Inc.*, 300 N.L.R.B. No. 14 (1990) (diversion of work); *M & J Supply Co.*, 300 N.L.R.B. No. 45 (1990) (duty of successor to two alter ego companies to bargain); *American Pacific Concrete Pipe Company*, 262 N.L.R.B. 1223 (1982); *Big Bear Supermarkets No. 3*, 239 N.L.R.B. 179 (1978); *see also Iowa Express Distribution, Inc. v. NLRB*, 739 F.2d 1305, 1311 (8th Cir.1984) (alter ego analysis is appropriate where the second corporation was formed before the first corporation ceased operating), *cert. denied*, 469 U.S. 1088, 105 S.Ct. 595, 83 L.Ed.2d 704 (1984).

This circuit has stated:

The focus of the alter ego doctrine, unlike that of the single employer doctrine, is on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets. Unlawful motive or intent are critical inquiries in an alter ego analysis, inquiries which are wholly absent in a single employer analysis. It is the alter ego finding which will bind a nonsignatory to a collective bargaining agreement, not a finding of single employer status.

*Penntech Papers*, 706 F.2d at 24 (citations omitted). Thus, the critical distinction between single employer and alter ego analysis is the presence or absence of anti-union animus, and the critical distinction between the results of the application of the two doctrines in the instant case is whether CEK and Cam–Ful will both be held to a collective bargaining agreement signed by one but not the other.

■ The parties agree on the factors to consider in determining alter ego status. These are anti-union animus, *id.*, and "substantially identical management, business purpose, operation, equipment, customers, and supervision, as well as ownership," [5] *Advance Electric*, 268 N.L.R.B. 1001, 1002 (1984). No one factor is controlling, and all need not be present to support a finding of alter ego status. *J.M. Tanaka Construction, Inc. v. NLRB*, 675 F.2d 1029, 1033 (9th Cir.1982); *NLRB v. Tricor Products, Inc.*, 636 F.2d 266, 270 (10th Cir.1980). There is also agreement as to the basic findings of fact made by the ALJ. The parties diverge, however, on the appropriate emphasis and interpretation to give the facts. The Companies argue in favor of the ALJ's finding of mere single employer status, which, absent a finding that the plumbing employees of both Companies constitute a single appropriate bargaining unit, is insufficient to hold both Companies to the terms of the Agreement. The Board argues that its alter ego finding is adequately supported by the record.

■ The Companies (and the ALJ) emphasize the following facts: (1) Cam–Ful pre-existed CEK; (2) CEK performed only plumbing work, whereas Cam–Ful performed more general construction services; (3) CEK used limited and light equipment, whereas Cam–Ful used heavy equipment; (4) CEK supervisors supervised only CEK employees, and Cam–Ful supervisors supervised only Cam–Ful employees; (5) CEK employees observed the separation of crafts, whereas Cam–Ful employees performed varied work functions; and (6)

---

5. Compare the factors in a single employer analysis: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership.

*Penntech Papers*, 706 F.2d at 25 (citing *Radio & Television Broadcast Union v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) (per curiam)).

there was no specific finding that Bradley was motivated by anti-union animus when he established CEK.

The Board, on the other hand, emphasizes these aspects of the record: (1) Bradley owned both Companies; (2) Bradley controlled labor relations at both Companies; (3) Bradley was the ultimate decision-maker on financial and operational matters for both Companies; (4) After CEK was formed and signed the Agreement with the Union, Cam–Ful's corporate purpose was enlarged to include construction work; (5) CEK frequently subcontracted work to Cam–Ful, without a competitive bidding process; (6) the Companies shared a book-keeper; (7) CEK employees occasionally worked on Cam–Ful projects; (8) the Companies frequently shared common jobsites, and on these occasions would sometimes share equipment; (9) the Companies performed similar work (on one occasion, both Companies bid on the same job); (10) Cam–Ful took over CEK's work and hired CEK's employees after CEK ceased operating; and (11) Bradley used obstructionist tactics in failing to respond to the Union, thus demonstrating anti-union animus.[6]

It is apparent that reasonable persons could differ—and indeed have differed—as to the appropriate interpretation to give these facts. The question is close. It is, however, a question of fact, and our review of the Board's fact-finding in a typical case is a narrow one. *Southport Petroleum Co.*, 315 U.S. at 106, 62 S.Ct. at 455–56. Section 10(e) of the NLRA provides that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record as a whole shall be conclusive." 29 U.S.C. § 160(e). It is not for the reviewing court to replace the Board's judgment with its own when the choice is "between two fairly conflicting views, even though the court would justifiably have made a different choice had the

matter been before it *de novo.*" *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *Destileria Serrallés, Inc. v. NLRB*, 882 F.2d 19, 22 (1st Cir.1989).

■ In cases such as this one, however, where the Board has reached a conclusion opposite of that of the ALJ, our review is slightly less deferential than it would be otherwise. *Litton Microwave Cooking Products v. NLRB*, 868 F.2d 854, 857 (6th Cir.1989); *Centre Property Management v. NLRB*, 807 F.2d 1264, 1268 (5th Cir. 1987). We "must take into account whatever in the record fairly detracts" from the Board's factual findings, and examine the evidence "in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465.

Examining the evidence supporting both the ALJ and the Board, we find that the Board's finding of alter ego status, including the important factor of anti-union animus, was supported by substantial evidence on the record as a whole. We still must find that the Companies were bound by the Agreement before we can conclude that the Companies committed an unfair labor practice by refusing to apply its terms to all their employees performing plumbing work.

**B.** *Was the Prehire Agreement Terminated or Automatically Renewed?*

■ The prehire Agreement between the multi-employer group and the Union, to which CEK was a signatory, provided:

This Agreement, therefore, is made and entered into by and between the Master Plumbers Association of Central New York, Incorporated ... acting for and on behalf of its members and other contrac-

---

**6.** This finding was based on Bradley's responses to the Union's requests for information regarding the relationship between Cam–Ful and CEK. The Union first wrote Bradley on April 7, 1983; he responded on August 17, 1983, with partial information. The Union followed up on September 21, 1983. Bradley's response to the Union's second request, dated November 24, 1983, began as follows: "This letter will start to answer the many burdensome questions in 21 Sept. letter." The letter then denied that Bradley had access to much of the requested information, and denied that Bradley was an owner of Cam–Ful after 1981. The ALJ found that Bradley was in fact the owner of both Companies at all times.

tors represented by the Association ... and Plumbers and Gasfitters Local Union No. 54.

The renewal provision of the Agreement stated:

This Agreement, which is in effect until June 30, 1983 shall automatically renew itself for an additional period of one (1) year from the termination date hereof unless either party serves written notice upon the other sixty (60) days prior to its expiration date requesting that it be amended or terminated.

The ALJ found, and the Companies argue, that by these provisions the Association was acting on behalf of its members as well as other contractors (including CEK) when it served notice of termination. The first clause names the two parties to the contract: the Association and the Union. Further, the use of the term "either party" in the renewal clause implies that there are only two parties to the Agreement.

The Board, however, rejected the ALJ's "restrictive reading of 'party' in the renewal clause." It found instead, and argues here, that because CEK was not a member of the Association and had not delegated bargaining authority to the Association, the Association's termination of the Agreement did not terminate the Agreement as between CEK and the Union. Therefore, because CEK had not served timely notice, the contract was automatically renewed for one year.

The circuit courts are divided on the issue of the degree of deference to give to Board interpretations of collective bargaining agreements. *Compare, e.g., Local Union 1395, IBEW v. NLRB,* 797 F.2d 1027, 1031 (D.C.Cir.1986) ("the Board's interpretation of contractual provisions is entitled to 'no particular deference' ") *with NLRB v. Southern California Edison Co.,* 646 F.2d 1352, 1362 (9th Cir.1981) (deference is appropriate). We find, however, that even under a less deferential posture, the Board's analysis of the contract is reasonable and supported by the evidence. Therefore, we agree with the Board's conclusion that the Agreement remained in force with respect to CEK.

### C. *The Deklewa Issue*

■ If the Agreement at issue here had been a full collective bargaining agreement between a § 9(a), 29 U.S.C. § 159(a), bargaining representative and CEK, our analysis above would lead to the conclusion that the Agreement should also be binding on Cam–Ful. The Agreement, however, was a prehire agreement of the type authorized in § 8(f). The Board has adopted special rules regarding the enforceability and repudiation of § 8(f) prehire agreements. The Companies argue (1) that this court should reject the Board's newly adopted rule regarding repudiation of prehire agreements as an unreasonable construction of the Act, or (2) that this rule should not be applied retroactively.

In *John Deklewa and Sons,* 282 N.L.R.B. 1375 (1987), *enf'd sub nom. International Assoc. of Bridge, Structural and Ornamental Iron Workers v. NLRB (Deklewa),* 843 F.2d 770 (3d Cir.), *cert. denied,* 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988), the Board announced a new position on the issue of when a party to a § 8(f) contract may repudiate that agreement. Prior to *Deklewa,* the Board had maintained that either party to a prehire agreement could repudiate that agreement at any time before the union obtained majority status in the appropriate bargaining unit. *See R.J. Smith Construction Co.,* 191 N.L.R.B. 693, *enf. denied sub. nom. Operating Engineers Local 150 v. NLRB,* 480 F.2d 1186 (D.C.Cir.1973). The bargaining unit in which majority status was measured was that of all employees in a multi-employer group, rather than merely those of an individual employer, under the "merger" doctrine. *Iron Workers v. NLRB (Deklewa),* 843 F.2d at 781 and n. 13. The moment at which the union obtained majority status was known as "conversion," because from that moment the union enjoyed full status as a § 9(a) bargaining representative. *Mesa Verde Construction Co. v. Northern California District Council of Laborers,* 861 F.2d 1124, 1133 (9th Cir.1988) (en banc) (*Mesa Verde I*). The Supreme Court approved this rule

as within the power of the Board. *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 265–66, 103 S.Ct. 1753, 1756–57, 75 L.Ed.2d 830 (1983); *NLRB v. Ironworkers Local 103 (Higdon Construction Co.)*, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978).

The *Deklewa* rule provides that § 8(f) imposes an obligation on the parties to a prehire agreement to comply with it. *Iron Workers v. NLRB (Deklewa)*, 843 F.2d at 778. That obligation is enforceable under §§ 8(a)(5) and 8(b)(3) unless the covered employees vote to reject the union as their bargaining representative in a Board-conducted election. *Id.* at 779. After expiration of the § 8(f) agreement, however, the signatory union—unlike a full § 9(a) representative—would enjoy no presumption of majority status. At that point, either party could repudiate the § 8(f) relationship. *Id.*

Most of the courts of appeals that have confronted *Deklewa* have approved the rule, although they have split on whether to apply *Deklewa* retroactively. *See United Brotherhood of Carpenters v. Mar–Len of Louisiana*, 906 F.2d 200, 203–04 (5th Cir.1990) (declining to adopt or reject *Deklewa*, but holding that it should not apply retroactively in the case before it); *NLRB v. Bufco Corp.*, 899 F.2d 608, 609 (7th Cir.1990) (adopting *Deklewa* and applying it retroactively); *Mesa Verde Construction Co. v. Northern California District Council of Laborers*, 895 F.2d 516, 518–19 (9th Cir.1989) (*Mesa Verde II*) (refusing to apply *Deklewa* retroactively), *cert. denied,* — U.S. ——, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990); *NLRB v. W.L. Miller Co.*, 871 F.2d 745, 749–50 (8th Cir.1989) (adopting *Deklewa* and applying it retroactively, except for an interest award); *Mesa Verde I*, 861 F.2d at 1131–34 (adopting *Deklewa*); *Iron Workers v. NLRB (Deklewa)*, 843 F.2d at 779–80 (enforcing *Deklewa* and applying it retroactively). *See also R.W. Granger & Sons, Inc. v. Eastern Massachusetts Carpenters Local 275*, 686

F.Supp. 22, 29 (D.Mass.1988) (applied retroactively); *Trustees of the National Automatic Sprinkler Industry Pension Fund v. American Automatic Fire Protection*, 680 F.Supp. 731, 734–35 (D.Md.1988) (no retroactive application); *Construction Industry Welfare Fund of Rockford v. Jones*, 672 F.Supp. 291, 293–94 (N.D.Ill. 1987) (no retroactive application). This court has not yet considered the issue.

We agree with our fellow circuits in holding that (1) Supreme Court precedent is not an obstacle to adoption of *Deklewa*, because in *Jim McNeff, Inc.*, 461 U.S. 260, 103 S.Ct. 1753, and *Higdon*, 434 U.S. 335, 98 S.Ct. 651, the Court was merely accepting the old *R.J. Smith* rule as within the Board's authority and not adopting the rule based on the Court's independent analysis; (2) the legislative history of § 8(f) supports the *Deklewa* non-repudiation rule better than the *R.J. Smith* approach; and (3) the *Deklewa* rule is an improvement over *R.J. Smith* in furthering the NLRA's policies of labor stability and employee free choice. *See Mesa Verde I*, 861 F.2d at 1128–34. We therefore adopt *Deklewa* as the law in this circuit.

The import of *Deklewa* in this case is clear. Pre-*Deklewa*, CEK would have been acting fully within its rights in repudiating the prehire agreement, provided that the Union had not achieved majority status under the conversion and merger doctrines. Under *Deklewa*, CEK would have had to conduct an election to ensure that the Union lacked a majority before repudiating the contract with impunity. Therefore, we must address the issue of whether it is appropriate to impose *Deklewa* retroactively against the Companies. "According a newly adopted rule retroactive effect is proper unless 'manifest injustice' results." *NLRB v. New Columbus Nursing Home, Inc.*, 720 F.2d 726, 729 (1st Cir.1983) (citing *Bradley v. School Board of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974)).[7]

---

**7.** Last term in *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, — U.S. ——, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990), the Supreme Court recognized, but did not resolve, an appar-

ent tension between the approach announced in *Bradley v. School Board of Richmond,* 416 U.S. at 715, 94 S.Ct. at 2018 (court should apply newly enacted law in effect at the time of appel-

In examining the cases in which other circuits have decided whether or not to give retroactive effect to *Deklewa*, we note that two factors appear to be controlling, one weighing for retroactivity and the other against. In those cases in which the rule was applied retroactively, there was evidence that the unions had nearly or actually achieved majority status through the conversion doctrine. *See Bufco Corp.*, 899 F.2d at 612; *W.L. Miller*, 871 F.2d at 749; *Iron Workers (Deklewa)*, 843 F.2d at 781. These courts reasoned that there would be no manifest injustice in applying *Deklewa* because even under the old rule the employer had acted at its own risk in repudiating the agreement.

The second factor is the historical or ongoing nature of the dispute. In cases in which there was no representation election still to be held and where the dispute was purely historical, the policies of labor stability and employee free choice would not be served by applying *Deklewa* to past conduct. *See Mar–Len*, 906 F.2d at 203–04; *Mesa Verde II*, 895 F.2d at 519.

Considering these factors, we find that this dispute is one in which manifest injustice would result from a retroactive application of *Deklewa*. There is no evidence that the Union had achieved a majority within the relevant bargaining unit. Moreover, as CEK is no longer in operation, the dispute is purely an historical one at this point. Applying *Deklewa* retroactively would subject the Companies to a penalty for having taken action which was entirely lawful under pre-*Deklewa* law. *Mesa Verde II*, 895 F.2d at 519 (quoting *National Automatic Sprinkler*, 680 F.Supp. at 735).

Retroactive application of the *Deklewa* principle, which involves altered rules of substantive conduct, would also plainly disappoint reasonable private expectations existing at the time of the relevant conduct about the right to repudiate prehire agreements. *See* note 7, *supra*. No doubt because the case was litigated before the ALJ as a § 8(a)(5) proceeding prior to the Board's announcement of the new *Deklewa* rule, the record is not altogether fully developed regarding repudiation. We are, nevertheless, satisfied that Cam–Ful had demonstrated repudiation sufficiently to benefit from pre-*Deklewa* law. "[A]n employer can repudiate a pre-hire agreement ... by engaging in conduct so overtly inconsistent with contractual obligations that it is sufficient to put the Union on notice of the employer's intent to repudiate." *Carpenters Southern California Administrative Corp. v. J.L.M. Construction Co.*, 809 F.2d 594, 598 (9th Cir.1987), *vacated and reh'g granted*, 840 F.2d 723 (9th Cir.1988), *vacated as moot*, 872 F.2d 930 (9th Cir. 1989). That is what Cam–Ful did here. Bradley made clear to Union representatives in the spring of 1983 that he was unwilling to sign prehire agreements for Cam–Ful because only a non-union company could be competitive on nonprevailing rate work. Bradley's actions were sufficient to put the Union on notice, well before the commencement of the alleged unfair labor practice, that he repudiated any agreement as comprehensive as that claimed by the Union. An employer may repudiate by "informing the Union *in some manner*" that the employer did not intend to be bound. *Gould v. Lambert Excavating, Inc.*, 870 F.2d 1214, 1219 (7th Cir.1989) (emphasis added). Further, an employer is not "obligated to repudiate its agreement

---

late decision unless retroactive application would result in manifest injustice) and that expressed in *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) ("[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."). We have recently suggested that the touchstone for deciding the question of retroactivity is whether retroactive application of a newly announced principle would alter substantive rules of conduct and disappoint private expectations. *Demars v.*

*First Service Bank for Savings*, 907 F.2d 1237, 1239–40 (1st Cir.1990). *See also American Trucking Assns. v. Smith*, —— U.S. ——, 110 S.Ct. 2323, 2338, 110 L.Ed.2d 148 (1990) ("When the Court concludes that a law-changing decision should not be applied retroactively, its decision is usually based on its perception that such application would have a harsh and disruptive effect on those who have relied on prior law ... If the operative conduct or events occurred before the law-changing decision, a court should apply the law prevailing at the time of the conduct.")

for all of its projects in order to repudiate effectively." *Wyoming Laborers Health & Welfare Plan v. Morgen & Oswood Construction Co.*, 850 F.2d 613, 623 (10th Cir. 1988). Nor did Cam–Ful attempt to take advantage of the benefits of a prehire agreement. Cam–Ful "did not perform any of [the] obligations under the pre-hire agreement, and ... never attempted to enjoy any benefits of the agreement." *J.L.M. Construction Co.*, 809 F.2d at 599.

A § 8(a)(5) violation could not be grounded on the failure of CEK to apply the terms of the automatically renewed 1981–1983 Agreement to its employees; CEK adhered to the terms of the Agreement as to those employees until it stopped doing business in the fall of 1983. These operative events took place well before 1987 when the Board announced its new rule as to repudiation of prehire agreements in *Deklewa*, and were fully consistent, under pre-*Deklewa* law, with a decision to repudiate any prehire agreement extending beyond CEK to Cam–Ful. We therefore hold that *Deklewa* should not be applied retroactively to this case, and we decline to enforce the Board's order attempting to do so.

Even in the absence of the repudiation we find here, there are procedural reasons as well which counsel against retroactive application of *Deklewa* in the context of an unfair labor practice charge. The Board's conclusion that CEK and Cam–Ful committed unfair labor practices in violation of § 8(a)(5) appears to have no basis in Board practice prior to *Deklewa*. As the Board pointed out in its brief, unrepudiated § 8(f) agreements had previously been enforceable under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. *See generally Jim McNeff, Inc.*, 461 U.S. at 270, 103 S.Ct. at 1758–59 (retroactively enforcing, under § 301, monetary obligation created by prehire agreement); *see also Plumbers & Pipefitters Local Union 72 v. John Payne Co.*, 850 F.2d 1535, 1539–40 (11th Cir.1988). But until *Deklewa*, it was settled that § 8(f) did not "expand the duty of an employer under § 8(a)(5), which is to bargain with a *majority* representative, to require the employer to bargain with a union with which he has executed a prehire

agreement but which has failed to win majority support in the covered unit." *Higdon*, 434 U.S. at 346, 98 S.Ct. at 658. Thus, it appears a § 8(f) agreement was not generally enforceable under § 8(a)(5). It was, at the very least, arguable that under the *R.J. Smith* rule in effect when this proceeding was commenced, an employer did not commit an unfair practice under § 8(a)(5) when it refused to honor a § 8(f) contract, unless the union had attained majority support and thereby created a full § 9(a) collective bargaining agreement through conversion. *Higdon*, 434 U.S. at 345, 98 S.Ct. at 657–58.

In *Deklewa*, of course, the Board overruled *R.J. Smith*, thus abandoning the conversion doctrine and deciding that a § 8(f) agrement could be enforced through the mechanism of a § 8(a)(5) proceeding. 282 N.L.R.B. 1375. But we are not inclined to enforce the Board's order here, in part because it is based on the conclusion that CEK violated § 8(a)(5) at a time when the settled avenue for resolving prehire agreement disputes was through a § 301 law suit.

### D. *Failure to Provide Information*

The final issue on appeal is whether substantial evidence supports the Board's finding that Bradley's failure to provide information requested by the Union constituted an unfair labor practice. Again, the Board rejected the ALJ's contrary finding in reaching its conclusion.

Bradley was required to provide the Union with the information it requested provided that the Union had a reasonable belief that Bradley was operating alter ego companies. *See Walter N. Yoder & Sons, Inc. v. NLRB*, 754 F.2d 531, 536 (4th Cir. 1985); *NLRB v. Associated General Contractors*, 633 F.2d 766, 771–72 (9th Cir. 1980), *cert. denied*, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981). There is little doubt that the Union had adequate grounds to believe that the Companies might be committing unfair labor practices. There is also little doubt, on review of the correspondence, that Bradley was less than forthcoming in his responses to the Union's

requests. The evidence appears more than substantial in support of the Board's finding of an unfair labor practice for failing to provide the requested information. Upholding this finding, however, still leaves the Union without a remedy, as the Board's order was directed primarily at remedying the repudiation of the Agreement, and ordering Bradley to supply the requested information at this time is rather pointless. For this reason, we decline to enforce that portion of the Board's order directing the Companies to provide the requested information.

Enforcement of the Board's order is therefore *denied*.