42 F.3d 45
 148 L.R.R.M. (BNA) 2153, 129 Lab.Cas. P 11,240
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
HOSPITAL SAN RAFAEL, INC., and Centro Medico Del Turabo,
Inc., and Its Subsidiaries, Turabo Medical Center
Limited Partnership and Hospital
Interamericano De Medicina
Avanzada, Respondents.
 No. 93-2026.
 United States Court of Appeals,
 First Circuit.
Heard April 5, 1994.
Decided Dec. 12, 1994.
 
 David A. Grant with whom Betty Southard Murphy, Jean H. Baker, Baker & Hostetler, Washington, DC, Heber E. Lugo-Rigau and Ledesma, Palou & Miranda, Hato Rey, PR, were on brief for respondents.
 Fred L. Cornnell with whom Frederick C. Harvard, Supervisory Atty., Daniel Silverman, General Counsel, Linda Sher, Acting Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, N.L.R.B., Washington, DC, were on brief for petitioner.
 Before BREYER,* Chief Judge, BOUDIN and STAHL, Circuit Judges.
 BOUDIN, Circuit Judge.
 
 
 1
 This is a difficult labor-law case made even more difficult because the pertinent doctrines have confusing labels, overlap with one another and occasionally mutate. We begin with the facts and procedural history, and then address the legal issues and the claims of error.
 
 I.
 
 2
 For many years, Hospital San Rafael, Inc., ("San Rafael") operated a neighborhood hospital in Caguas, Puerto Rico. In 1978, two doctors--Jaime Soler and Jose Badillo--bought somewhat over 80 percent of San Rafael's stock; Soler owned about 70 percent of the joint holdings and Badillo about 30 percent. The doctors then hired Joaquin Rodriguez as the hospital's president. These three individuals comprised the hospital's board.
 
 
 3
 San Rafael was in poor financial shape, and in mid 1978 the Puerto Rico health authorities said that the hospital would have to remedy problems in its physical plant or lose its eligibility to treat Medicare patients. Medicare patients accounted for almost half of the hospital's occupancy. Soler, Badillo and Rodriguez began to discuss the construction of a new hospital. It was conceived that a new corporation would be established, partly because San Rafael itself could not obtain loan funds, and in addition the new hospital was expected to be more than a local hospital and to draw patients from the Caribbean basin.
 
 
 4
 Centro Medico was created in August 1978 to operate the proposed new hospital under the name Hospital Interamericano de Medicina Avanzada ("Hospital Interamericano"). In 1981, Soler had 40 percent of the shares, Badillo 20 percent and Rodriguez 20 percent. Ultimately, Soler's ownership was reduced to 38 percent, Badillo and Rodriguez each owned about 19 percent, and 19 percent was acquired by Carlos Pineiro, a longtime associate of Rodriguez. From the start Rodriguez was Centro Medico's president, and Soler and Badillo were among the board members.
 
 
 5
 At various times, Rodriguez spoke about the new hospital as if it were an expansion of San Rafael, and San Rafael made interest-free cash advances for the construction of the new hospital and took other steps to support its development. San Rafael was granted a waiver as to its Medicare deficiencies because of the plans to open a new hospital. Later, San Rafael agreed to surrender its own license to operate a hospital, in order to facilitate the licensing of the new hospital.
 
 
 6
 San Rafael ceased operation on November 14, 1988. On November 18, 1988, the new Centro Medico hospital, operating as Hospital Interamericano, opened to the public. Rodriguez, Soler and Badillo continued to hold their prior positions. Pineiro, who since 1987 had been responsible for labor relations at San Rafael, became the new hospital's executive vice president. A majority of the supervisors of San Rafael and most of the other employees transferred to the new hospital.
 
 
 7
 Against this background labor disputes developed that led to the present litigation. In January 1984, the Union Nacional de Trabajadores de la Salud, Local 1199 ("the union") became the certified collective bargaining representative of two units of San Rafael employees: a professional unit (e.g., registered nurses) and a technical unit that included other employees. San Rafael and the union entered into an agreement effective from September 1, 1984, to August 31, 1987, also agreeing that this contract would continue until a new contract replaced it.
 
 
 8
 San Rafael employee Milton Suarez had been a leader in the organization of the union and had been discharged for his organizing activities, although later reinstated. Suarez helped negotiate the September 1984 contract and became the union's chief steward. In 1985, Suarez began to question San Rafael about the effect that the planned new hospital would have on job security. On August 30, 1985, Rodriguez issued a memorandum to San Rafael employees stating "on behalf of Hospital San Rafael and of Centro Medico del Turabo" that the employees would be "transferred" with the same salary and benefits to the new hospital.
 
 
 9
 In May 1987, the union sought to begin negotiations for a new contract and proposed an agreement naming both San Rafael and Centro Medico as parties. San Rafael indicated that Centro Medico would not recognize or bargain with the union because it was certified only to represent San Rafael employees. The National Labor Relations Board (the "Board" or "NLRB") issued a complaint charging that San Rafael and Centro Medico were a single employer and alter egos, and had unlawfully refused to bargain with the union over the inclusion of Centro Medico.
 
 
 10
 The union reached separate settlement agreements with San Rafael and Centro Medico in May 1988. San Rafael agreed to negotiate in good faith with the union, and Centro Medico promised to hire on a nondiscriminatory basis and to retain 95 percent of San Rafael's employees to work at the new hospital; Centro Medico stipulated that it was not thereby agreeing to recognize the union. The union, in exchange for the settlements, withdrew its unfair labor practice charges, and the NLRB then withdrew the complaint.
 
 
 11
 Negotiations between the union and the two hospitals did not prove fruitful. In October 1988, the union filed a petition with the NLRB seeking to have the settlement agreements set aside, and the pre-agreement unfair labor practice charges reopened, because San Rafael had not complied with the settlement agreement. In August 1989, the district court granted a preliminary injunction requiring Centro Medico to bargain in good faith, and this court affirmed. See Asseo v. Centro Medico Del Turabo, Inc., 900 F.2d 445 (1st Cir.1990).
 
 
 12
 From the outset in 1988, the new Centro Medico hospital claimed that it was free to alter working conditions at will and that it need not recognize the union. Although most San Rafael employees were hired by the new hospital, Suarez was not. Neither were four other employees who had been closely connected with union activities and acted at one time or another as union stewards. In these five cases the new hospital did not formally refuse to hire the employees; several were told that their applications were under review, but Centro Medico then took no official action on the applications.
 
 
 13
 In December 1989, the union filed new unfair labor practice charges. These included charges that both hospitals had failed to bargain in good faith and had engaged in unfair labor practices by refusing to hire the five union-related employees. A Board complaint was filed in February 1989. On May 4, 1989, an administrative law judge entered an order conditionally setting aside the settlement agreements, reinstating the old charges and consolidating them with new ones. Hearings were held between May 1989 and May 1990.
 
 
 14
 On June 19, 1991, the ALJ found that San Rafael and Centro Medico were alter egos and comprised a single employer; alternatively, Centro Medico was found to be a successor employer to San Rafael. The ALJ found that the San Rafael settlement agreement had been entered into in bad faith and should be permanently set aside. The ALJ also found that the hospitals had violated their duty to bargain, 29 U.S.C. Sec. 158(a)(5), and Centro Medico's failure to hire four of the five employees was also found to be wrongful. Id. Sec. 158(a)(3).
 
 
 15
 On review, the Board, acting through three members, found that the two hospitals were a single employer and alter egos but did not reach the successor-employer issue. The Board agreed with the ALJ that the hospitals had improperly failed to bargain with the union and that Centro Medico had unilaterally changed employee working conditions. Failure to rehire all five employees was found to be improper. By a divided vote, the Board held that the San Rafael settlement agreement was properly set aside.
 
 
 16
 The Board entered a remedial order containing specific provisions designed to compel Centro Medico to bargain and to provide redress for the five employees. The Board order also broadly forbade future infringement of worker rights protected under "section 7." 29 U.S.C. Sec. 157. The Board then filed in this court the present application to enforce its order. 29 U.S.C. Sec. 160(e). The hospitals opposed the application.II.
 
 
 17
 In this court, the main issue raised by the hospitals is whether San Rafael and Centro Medico can be treated for present purposes as if they were one entity. This issue is critical because the only signed collective bargaining agreement is between the union and San Rafael. Centro Medico is required to respect that agreement, and bargain before making unilateral changes in working conditions, only if Centro Medico is an extension of San Rafael. We therefore begin by describing three different but related labor-law doctrines considered by the agency.
 
 
 18
 One concept, known colloquially as the alter ego doctrine, says that in certain situations one employer entity will be regarded as a continuation of a predecessor, and the two will be treated interchangeably for purposes of applying labor laws. The easiest example is a case where the second entity is created by the owners of the first for the purpose of evading labor law responsibilities; but identity of ownership, management, work force, business and the like are also relevant. See C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB, 921 F.2d 350 (1st Cir.1990).
 
 
 19
 A second rubric--the "single employer" doctrine--has its primary office in the case of two ongoing businesses which the NLRB wishes to treat as a single employer on the ground that they are owned and operated as a single unit. Penntech Papers, Inc. v. NLRB, 706 F.2d 18 (1st Cir.), cert. denied, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). Most of the alter ego criteria remain relevant but motive is normally considered irrelevant. The consequences of single employer and alter ego status are not necessarily the same. See C.E.K., 921 F.2d at 354.
 
 
 20
 A final, narrower doctrine applies to so-called "successor" companies. Where, for example, a unionized business is acquired by a new owner unaffiliated with the old one, the new employer may not be bound by a collective bargaining agreement with the old one. See NLRB v. Burns Sec. Servs., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). But where enough continuity exists in the business and work force, the new owner may, without any new certification, be required to treat the union as the recognized bargaining agent. E.g., Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987).
 
 
 21
 This overview of the three doctrines imparts to them a neatness that is not borne out by the circuit caselaw or even the Board's decisions. See, e.g., 4 T. Kheel, Labor Law Sec. 17.02 (1994). In part, the difficulty is that several related and similarly named concepts are being used to address different controversies (e.g., jurisdictional aggregation, maintenance of parallel union and non-union businesses, inherited liability for past misconduct, inherited contractual obligations, carry-over obligation to bargain, etc.).
 
 
 22
 In all events, the Board's order here in dispute can be sustained on the alter ego theory. The single employer doctrine, as it has developed historically, seems to have little application to this case--which does not involve two ongoing businesses coordinated by a common master. See A. Dariano & Sons, Inc. v. District Council of Painters, 869 F.2d 514, 519 (9th Cir.1989); International Union of Operating Eng'rs v. Centor Contractors, Inc., 831 F.2d 1309, 1313 n. 2 (7th Cir.1987). As for "successor" status, any relief available under this theory would be less far reaching than that based on the alter ego theory.
 
 
 23
 In determining alter ego status, the NLRB and the courts have, as noted in C.E.K., considered a range of criteria including the similarity between the old and new companies in relation to management, business purpose, operation, equipment, customers and supervision, as well as ownership. In most cases, a further important factor in determining alter ego status is whether the alleged alter ego entity was created and maintained in order to avoid labor obligations. In a rare discussion of the doctrine, the Supreme Court said:
 
 
 24
 It is important to emphasize that this is not a case where the successor corporation is the "alter ego" of the predecessor, where it is "merely a disguised continuance of the old employer." Southport Petroleum Co. v. NLRB, 315 U.S. 100, 106 [62 S.Ct. 452, 456, 86 L.Ed. 718] (1942). Such cases involve a mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management. In these circumstances, the courts have had little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor.
 
 
 25
 Howard Johnson Co. v. Hotel Employees, 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 2242 n. 5, 41 L.Ed.2d 46 (1974).
 
 
 26
 Howard Johnson supplies an animating purpose for the alter ego doctrine, and also helps sort out the relationship between subjective motive and objective criteria. Motive matters, we think, because a corporate transfer or transformation for the purpose of avoiding labor law obligations is an unsympathetic case for respecting the formal alteration, and faced with a subterfuge--e.g., a sham transfer of assets--the courts reasonably need give less weight to the other "identity" criteria. See Penntech Papers, 706 F.2d at 24.
 
 
 27
 But in our own case the decision of San Rafael's owners to establish a new hospital occurred for financial and operational reasons that have nothing to do with labor relations. The union did not even exist when the original plans for the new hospital were laid. The Board's claim that Centro Medico's "purpose" was not improper at the outset but became improper simply because Centro Medico declined to bargain makes little sense in the context of the alter ego doctrine. After all, if the two companies were not alter egos, Centro Medico's desire to resist obligations or liabilities of San Rafael would be understandable. If an improper motive in creating the new entity were a sine qua non of the alter ego doctrine, then we think the Board would be hard-pressed to defend its order in this case.
 
 
 28
 In Howard Johnson, however, the Supreme Court said that wrongful motive is "frequently" present in the alter ego cases; it did not say "always." Similarly, we have said that "[n]o one factor is controlling, and all need not be present to support a finding of 'alter ego status.' " C.E.K., 921 F.2d at 354. After all, if a company merely changed its corporate form for legitimate tax or corporate reasons, it is hard to see why the new entity should be able to disregard an existing collective bargaining agreement or claim immunity when told to reinstate a worker wrongly fired by the old one. This view--that a wrongful motive is not required--is shared by most other circuits. See Note, 86 Mich.L.Rev. 1024, 1045 (1988) (collecting cases).[1]
 
 
 29
 The problem here, as so often with similar concepts, is in how far to carry the notion of "disguised continuance," Howard Johnson, 417 U.S. at 249 n. 5, 94 S.Ct. at 2242 n. 5, where there is substantial continuity but also some limited change in ownership and operations. Continuity of ownership, perhaps the most important predicate, does exist in this case. Soler and Badillo owned 87 percent of the stock in San Rafael; and the same individuals came to own about 60 percent of the stock in Centro Medico, their proportionate shares inter se remaining the same. The two other important stockholders of Centro Medico, Rodriguez and Pineiro, were closely associated with San Rafael.
 
 
 30
 Other criteria of identity point in the same direction. In upper management, Rodriguez served as president both of San Rafael and Centro Medico. Soler, Badillo, Rodriguez and Pineiro were directors, officers or both in each of the two entities. The ALJ found that about 85 of the 102 lower level supervisors at the new hospital had also been supervisors at the old one. The new hospital agreed to hire 95 percent or more of the old hospital's employees and the ALJ said that this had occurred.
 
 
 31
 The two hospitals are in the same business and operate in the same community. It is true that Centro Medico operates a 300-bed tertiary care hospital and presumably draws from a larger area; San Rafael was a local hospital with just over 100 beds. Little of the equipment was transferred from one to the other and doctors' privileges had to be renewed. But San Rafael effectively planned the new hospital, helped finance it, and surrendered its license so the new one could obtain a license. Both in origin and function, the new hospital is essentially an enlargement of the old one.
 
 
 32
 Thus, a substantial--not a complete--identity exists between the two hospitals along every axis: ownership, senior management, supervisory management, employee base, geographic location and basic business function. The alter ego doctrine has been devised by the Board with approval of the courts, and the agency is entitled to a reasonable latitude in applying its own doctrine. See generally Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). Whether the alter ego doctrine can be stretched much beyond the present facts may be open to debate, but this case is within reasonable limits.
 
 
 33
 Next, San Rafael claims that the Board was not warranted in setting aside the May 19, 1988, settlement agreement between the union and San Rafael. In prior cases, the Board has set aside settlements where the settlement agreement has been materially breached and the party responsible entered into the agreement in bad faith without an intention to carry out its commitments. E.g., Norris Concrete Materials, 282 N.L.R.B. 289 (1986). In this case, the ALJ set the settlement agreement aside on the ground that San Rafael entered into it in bad faith and then breached the agreement. The Board sustained this determination by a two-to-one vote, one member dissenting on this issue alone.
 
 
 34
 We review the findings of the Board only to determine whether they are supported by substantial evidence. 29 U.S.C. Sec. 160(e). The ALJ, whose rationale was adopted in a condensed form by the Board majority, said that the two hospitals had to know of their own internal relationship and therefore, knew or should have known their legal status as alter egos; that the promise by San Rafael to bargain in good faith therefore included a commitment to bargain on behalf of Centro Medico; and that because San Rafael resisted that obligation it must never have meant to carry out this attributed commitment.
 
 
 35
 We think that this reasoning is unpersuasive and that no other evidence shows that the agreement was entered into in bad faith. There is proof that San Rafael knew that it had a duty to bargain for Centro Medico. The ALJ said that San Rafael "should have known" of its prospective alter ego status, but we do not see why. The two hospitals are not identical in every respect, no mathematical formula determines alter ego status, and this case is a close one. Bad faith is more than mere negligence. See Voccio v. Reliance Ins. Cos., 703 F.2d 1, 2 (1st Cir.1983). The Board's brief hints that bad faith may not be required, but bad faith was the only basis given in this case. SEC v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).
 
 
 36
 However, there is no showing by the hospitals that the setting aside of the settlement agreement had any effect on the Board's other determinations or on any of the provisions of its remedial order. Conduct occurring after the settlement agreement was the subject of new unfair labor practice charges in December 1988. These included both failure to bargain and discrimination against union members. These charges are amply supported by the record even if only conduct after May 1988 is the focus of consideration.
 
 
 37
 On the failure to bargain charge, Centro Medico persistently refused to recognize the union and, shortly after the new hospital opened, it made unilateral changes in the employees' working conditions without attempting to bargain. Since we have upheld the alter ego theory advanced by the Board, we think that it follows that Centro Medico was obligated to recognize and bargain with the union; that it was bound by the collective bargaining agreement to the same extent as San Rafael; and that it was subject to the ordinary obligations of an employer with a union contract to negotiate about changes. Good faith is not generally a defense to such charges. ILGWU v. NLRB, 366 U.S. 731, 738-40, 81 S.Ct. 1603, 1607-09, 6 L.Ed.2d 762 (1961); NLRB v. Cooke & Jones, Inc., 339 F.2d 580, 581 (1st Cir.1964).
 
 
 38
 The Board also had ample evidence for its finding that the five named union members not rehired were the subject of anti-union discrimination by Centro Medico. It is sufficient to say that all five employees were identified with the union, no persuasive reason appears why any of them was so refused a position at the new hospital, and the excuses or evasions practiced by Centro Medico in dealing with each of the five affirmatively suggests that discrimination was being practiced. The Board and administrative law judge decisions adequately set forth the circumstances.
 
 
 39
 We turn now to remedy. The treatment of the five employees was egregious enough to justify the Board's broad remedial direction that the hospitals cease and desist from infringing "in any other manner" on employees' section 7 rights. The hospitals say that a proper order would merely prohibit Centro Medico from acting "in any like or related manner," but the broader version--carrying with it the risk of contempt sanctions--has been found proper where the employer's violations are either repeated or egregious. Wyman-Gordon Co. v. NLRB, 654 F.2d 134, 146-47 (1st Cir.1985). None of the other remedial provisions are challenged, and each other remedy appears justified by post-settlement misconduct by the hospitals.
 
 III.
 
 40
 To sum up, we agree with the hospitals that the bad faith finding as to the May 1988 settlement and the setting aside of the San Rafael settlement agreement are not supported. We are also doubtful whether the "single employer" doctrine could be a basis for sustaining the Board's order. But the alter ego doctrine reasonably applies; the unfair labor practice findings are adequately supported by the post-settlement misconduct; and the remedies ordered are within the Board's discretion. Accordingly, we enforce the Board's order as written.
 
 
 41
 It is so ordered.
 
 
 
 *
 Chief Judge Stephen Breyer heard oral argument in this matter, but did not participate in the drafting or the issuance of the panel's opinion. The remaining two panelists therefore issue this opinion pursuant to 28 U.S.C. Sec. 46(d)
 
 
 [1]
 Since our discussion in Penntech and C.E.K. has given rise to some uncertainty about this court's position on the role of wrongful motive in alter ego cases, this opinion has been circulated prior to filing to all active judges of this court, and no member of the court expressed disagreement with the panel's treatment of the issue. This informal circulation is without prejudice to a petition for rehearing or suggestion of en banc reconsideration on any issue in the case. See Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 9 n. 5 (1st Cir.1992)