**WILSON AND SONS HEATING AND PLUMBING, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 91–1308.

United States Court of Appeals, District of Columbia Circuit.

Argued April 13, 1992.

Decided Aug. 7, 1992.

As Amended Aug. 7, 1992.

Anna K. Holmberg, Ithaca, N.Y., for petitioner.

David A. Seid, Attorney, N.L.R.B., with whom Jerry M. Hunter, General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Linda Dreeben, Supervisory Attorney, Washington, D.C., were on the brief, for respondent.

Before: SILBERMAN, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The principal claim here arises out of a special provision of the National Labor Relations Act relating to the construction industry. Section 8(f), 29 U.S.C. § 158(f) (1988), permits construction employers and unions to enter into collective bargaining agreements before the union has established its majority status. Under the Board's decision in *John Deklewa & Sons, Inc.*, 282 NLRB 1375 (1987), aff'd sub nom. *International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770 (3d Cir.1988), an employer violates §§ 8(a)(1) and 8(a)(5), 29 U.S.C. §§ 158(a)(1) and 158(a)(5), which bar anti-union coercion and refusals to bargain, if it repudiates a § 8(f) agreement before it expires. Once it does expire, however, the union enjoys no presumption of majority status, so either party may freely repudiate the § 8(f) relationship at any time. *Deklewa*, 282 NLRB at 1386–87. At that point the employer is no longer subject to a duty to bargain. See *Bentson Contracting Co. v. NLRB*, 941 F.2d 1262, 1269 (D.C.Cir.1991).

Here the Board found that petitioner Wilson and Sons, a family-run residential and commercial heating and plumbing business, violated the Act by refusing to bargain with the union and by negotiating directly with its single employee at the time, John Gould. That decision rested on a finding that Wilson, which was bound by a letter of assent to a one-year master agreement between the union and an employers' association, was also bound for another year by an automatic renewal clause in the master agreement, even though the association had prevented automatic renewal as to itself by giving suitable notice and negotiating a new agreement. As we find that the master agreement's renewal clause was not enough to bind Wilson for another year under the circumstances, we grant Wilson's petition for review and deny the Board's cross-application for enforcement.[1] We also find for Wilson on the case's narrower issues.

\* \* \* \* \* \*

Between 1976 and 1984 Wilson signed successive letters of assent binding it to each of a series of area-wide collective bargaining agreements (typically for a one-year term) between the union, United Association of Plumbers, Pipefitters and Apprentices, Local 109, and an employers' association, the Mechanical Contractors of South Central New York. Wilson has never been a member of the association. The 1983–84 agreement, for which Wilson signed a letter of assent on October 28, 1983, by its terms ran until May 31, 1984. Article IV provided for automatic renewal:

Section 2: It is understood and agreed that articles and or sections of these working rules will not be changed before the termination of this Agreement and that if either of the parties hereto desire to make changes in this Agreement, the party desiring such changes, shall make a request therefore in writing, of the other party, three (3) months before the termination of this Agreement, and all Conferences and negotiations shall be settled, and Agreement signed by Em-

---

**1.** Since our interpretation of the contract requires us to dismiss the claims dependent upon Wilson's being bound by contract after May 31, 1984, we need not pass on Wilson's other defenses to those claims—that the company was a one-person unit and thus exempt from the Act's coverage during the period in question, and that the retroactive application of *Deklewa* here was improper.

ployer and Union thirty (30) days before termination of the Agreement.

Section 3: This Agreement shall automatically be renewed from year to year after its expiration date, unless either of the parties hereto request a change therein before the termination hereof, as above provided.

On June 1, 1984 Louis Haller, the union's business manager, asked Charles Wilson whether the company was planning to sign a letter of assent to the new association contract, which was to be in effect from June 1; 1984 to May 31, 1985. Haller said that if Wilson did not sign the parties would have no contract, so he would probably withhold the services of Wilson's one employee at the time, John Gould. On June 4 Haller brought over the letter and asked Charles Wilson to sign, but he refused. That day Gould did not report to work because Haller had told him he couldn't unless Wilson signed a new contract. Gould was offered a job with another union contractor, but he turned it down and approached the Wilsons to negotiate employment directly with them; he and the Wilsons reached agreement on June 7 and he resumed work.

On June 12 Haller called Charles Wilson and said that because of the automatic renewal clause he *now* thought that the company *did* have a contract with the union. He also sent a letter along the same lines, but the company did not respond.

After a decision by an administrative law judge that was mooted by the Board's decision in *Deklewa,* and a remand by the Board for reconsideration in light of *Deklewa,* the ALJ found that Wilson's repudiation of the contract, and its bargaining with Gould, were unfair labor practices. The Board affirmed. *Wilson & Sons Heating & Plumbing, Inc.,* 302 NLRB No. 126 (1991) (*"NLRB Decision "*). It *assumed* that the company was bound by the automatic renewal provision in the master agreement, noted that the company had not given the required three-months notice of intent to modify, and concluded that the contract had renewed for an additional one-year term on May 31, 1984. *Id.,* slip op. at

2–3. Chairman Stephens dissented on this aspect of the case, reasoning that

an employer who does nothing more than sign a letter of assent to be bound by a master agreement negotiated by an employer association should not be found to have agreed to automatic renewal of the original agreement when (1) the *signatory* parties to the master agreement have themselves forestalled renewal by giving notice to terminate and negotiating new terms for a successor agreement, and (2) the letter of assent itself contains no terms concerning duration of the agreement.

*Id.,* dissent at 1 (emphasis in original).

In contrast to the substantial deference accorded the Board's fact findings, policy decisions, and choice of remedies, we give its interpretation of a contract "no particular deference", *Retail Clerks International Ass'n Local No. 455 v. NLRB,* 510 F.2d 802, 805 (D.C.Cir.1975), but determine the meaning of the contract independently. See *Litton Financial Printing Division v. NLRB,* —— U.S. ——, —— ——, 111 S.Ct. 2215, 2223–24, 115 L.Ed.2d 177 (1991); *Local Union 1395, International Brotherhood of Electrical Workers v. NLRB,* 797 F.2d 1027, 1030–31 (D.C.Cir.1986).

The language of the master agreement is inconclusive. Article IV refers to possible requests to amend by "either of the parties hereto", seeming to allude specifically to the association and the union—technically the parties to the agreement. But as a matter of pure language this could encompass all parties who either signed the contract itself or letters of assent adopting its terms. (The letter of assent refers to the association contract by date and says that the company "agrees to adhere to and be bound by all the terms thereof, as well as revisions and amendments adopted pursuant [sic] thereto".) But not only was Wilson not a member, but the association itself negotiated a new contract for 1984–85, so the 1983–84 one did *not* renew as to the association or its members. It would surely be anomalous to bind the company to the terms of an agreement that no longer existed, see *NLRB Decision,* Stephens dissent

at 1, especially as Wilson's past letters of assent presumably reflected a notion that its labor costs would likely remain competitive if its labor relations were no more onerous than its competitors'. That premise would obviously be undone if the association members secured a new agreement more favorable than the old while Wilson remained tied to the old.[2]

Although this structural anomaly may well be enough for us to conclude that the documents compel the company's reading, in light of the linguistic ambiguity we press on to examine the extrinsic evidence. Compare *Local Union 1395*, 797 F.2d at 1036 (considering extrinsic evidence even where contract's language seemed plain); *Cities of Bethany v. FERC*, 727 F.2d 1131, 1144 (D.C.Cir.1984) ("parties' course of performance under a contract may give meaning to otherwise unclear contract terms"), with *American Postal Workers Union v. United States Postal Service*, 940 F.2d 704, 707–08 (D.C.Cir.1991) ("In the absence of ambiguity in the collective bargaining agreement ... we have no cause to examine extrinsic evidence of the parties' intent.").

The company and the union appear to have construed both the 1982–83 and 1983–84 contracts as terminating on their expiration dates, even though both contained identical automatic renewal clauses. In June 1983, at the end of the 1982–83 agreement, the company refused for months to sign a letter of assent binding it to the newly completed 1983–84 master agreement, but nonetheless began to comply with the wage rates and benefit terms of the *new* contract—rather than continuing to observe the terms of the old one as if it had automatically renewed. Further, when the company finally signed a letter of assent in October 1983, it was acting in response to the threat by the union agent, Haller, to "pull our men" unless he signed—a threat in turn based on *Haller's*

view that no contract existed between the parties.

The parties' conduct at the end of the 1983–84 agreement also suggests that they didn't think that that agreement had automatically renewed on May 31, 1984. At the time, Haller asked the company to sign a letter of assent binding it to the terms of the new contract; he specifically stated his understanding that the parties no longer had a contractual relationship, Joint Appendix ("J.A.") at 226, 350, and in later testimony he acknowledged that this assumption "was based on the way that we had always done things in the past to some degree", *id.* at 226. The union also instructed Gould, the company's only employee at that point, not to report to work because there was no contract—an action that would have breached Article II of the association agreement had it bound the parties at that time. Whether or not the union's initial assumption that there was no contract constituted a waiver of any potential right to automatic renewal, compare Petitioner's Brief at 27, with NLRB Brief at 20, that assumption, read in the context of the parties' conduct at the end of the previous agreement, is strong evidence that they did not think the company was bound by the renewal provision.

The Board relies heavily on the decision of the First Circuit in *C.E.K. Industrial Mechanical Contractors, Inc. v. NLRB*, 921 F.2d 350, 355–56 (1st Cir.1990), upholding a Board decision that a substantially similar automatic renewal clause in an association agreement *was* binding on companies that were not members of the association, even though the association itself terminated the master agreement. In *C.E.K.*, however, the court made no mention of any extrinsic evidence demonstrating past practice inconsistent with the parties' intent to bind themselves to the renewal provision. In addition, the standard of review applicable to the Board's judgment on contract interpretation was unclear at the time, and

---

2. · It is not clear whether the new agreement here was in fact more favorable to employers than the old, but the structural anomaly must be viewed *ex ante,* quite independently of that circumstance. It would be folly for non-association members to bind themselves to automatic renewal if the association could obviate renewal as to its members by a notice given on the last possible day or given without disclosure to non-members.

the First Circuit, while purporting not to apply the highest possible level of deference, did not decide the question de novo as we do here. See *id.* at 356 (concluding that "the Board's analysis of the contract is reasonable and supported by the evidence"). Finally, the court did not address the anomaly that would result from an employer's being held to a derelict agreement.

\* \* \* \* \* \*

 The Board also held that Wilson violated §§ 8(a)(1) and 8(a)(5) in refusing to comply with a union request to audit the company's books. Because there is virtually no support for a finding essential to the Board's conclusion, we reverse this aspect of the decision for want of substantial evidence. See 29 U.S.C. § 160(e) (Board's fact findings conclusive if supported by substantial evidence on the record as a whole); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Further, we must also set aside a Board finding of an unfair labor practice based on Wilson's alleged failure to pay contract wage rates to one Frank Horvath; the charge was filed out of time, and for reasons that we will explain the doctrine of relation back is inapplicable.

Horvath was first hired as a trainee in 1982 under an informal agreement between the company and Haller. During the training period, he was to be paid at a rate lower than the union wage scale. He was laid off in March 1983, but rehired in September 1983 after he passed the union's journeyman exam; the company did not pay him the contract rate for journeymen, however, or require him to join the union. Haller, the union agent, soon discovered that Horvath had been rehired and arranged to have him join the union. After that the company made fringe benefit contributions required under the contract but did not raise Horvath's pay to the union level.

In January 1984 Haller called Charles Wilson and asked him to remind Horvath to pay his union dues; Wilson said that the checkoff reports might be erroneous, as he assumed Horvath was paying the dues.

Haller reviewed the checkoff reports and noticed that Horvath was not being paid the union rate; he wrote to the company on January 24 and said he would file a grievance unless Wilson could prove that Horvath had been paid the proper rate. He sent a follow-up letter on February 3 to the same effect, and eventually verified the pay discrepancy after he asked Horvath to send him his pay stubs.

More than two and a half months later, in late April, Haller told the Wilsons he wanted to have an accountant audit the company's books, explaining that the union wanted to verify the company's contributions to fringe benefit funds. Steve Wilson refused. Haller then sent a letter repeating his request, referring to a "right to audit" grounded in a contract provision permitting audits regarding certain fringe benefit funds. See Letter from Louis Haller to Charles and Steve Wilson of 4/23/84. The provision referenced, article III, § 4(b), established such a right for the benefit funds' *accountants:*

> The books and records of each employer pertinent to the employment of employees covered by this Agreement shall be made *available* at all reasonable times *for inspection and audit by the accountants of the Funds,* including without limitation, all payroll sheets, W–2 Forms, New York State Employment Reports, Social Security Reports, Insurance Company Reports and Supporting Checks, ledgers, vouchers and any other items concerning payrolls. *Inspection shall be restricted to verification of payments made and/or due to the Funds.*

(Emphasis added.)

As Haller received no response, the union's attorneys wrote another letter on May 3 along the same lines; on May 10 Haller again spoke with the Wilsons by telephone, and they refused the audit request. Then on July 3 the union's attorneys sent a final letter, enclosing a copy of the previous one, specifically stating that the purpose of the audit was related to the union's fringe benefit funds.

In finding the audit refusal an unfair labor practice, the Board rested (and here rests) *solely* on the view that the company's bargaining duty required it to grant a union request for data relating to its actual wage payments—to wit, Horvath's. See *NLRB Decision,* slip op. at 8–11; see also *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 435–36, 87 S.Ct. 565, 567–68, 17 L.Ed.2d 495 (1967) (employer bound to supply information needed for union's fulfillment of its collective bargaining duty); *Oil, Chemical & Atomic Workers v. NLRB,* 711 F.2d 348, 358–59 (D.C.Cir.1983) (same). Even though the union's request letters addressed only the contract's fringe benefit audit clause, and Haller never suggested any alternative basis, the Board found that the Wilsons must have known that the *real* purpose was to check Horvath's wages. It based this on the correspondence between the parties over the treatment of Horvath—correspondence that limped to a conclusion nearly three months before the first audit request—and testimony indicating that the company knew the audit would disclose that Horvath was not being paid at the contract rate.

The Board offers no explanation as to why the Wilsons should have been such skilled mind readers. Nearly three months separated the episodes, and there was no evidence of anything to put the company on notice of the supposed connection. The Board's reliance on *NLRB v. Rockwell–Standard Corp.,* 410 F.2d 953, 958 (6th Cir.1969), see *NLRB Decision,* slip op. at 10, is clearly misplaced. There the court found that an employer's nonresponsiveness to a request for information violated its statutory duty, but the union had specifically identified the purpose of its request. Here, by contrast, Haller's only theory of relevance had been the need to audit the fringe benefit funds, a right that article III, § 4(b) of the contract assigns to "the accountants of the Funds". The Board also cites decisions of its own for the proposition that an employer may not simply make a blanket refusal of an ambiguous request—*Keauhou Beach Hotel,* 298 NLRB No. 94 (1990); *A–Plus Roofing, Inc.,* 295 NLRB No. 101 (1989). But in

neither of those cases had the union affirmatively invoked a specific ground for inspection that was both different from its real ground and defective; nor was there any doubt that the companies actually knew why the requests were made. Here the union did not manage the funds, so the sole ground asserted by the union to support the inspection was inapplicable, and the company had no basis for knowing the union actually had a different purpose. The Board's finding that the Wilsons were on notice that the request was aimed at verifying Horvath's wages is unsupported by substantial evidence and was essential to its decision. Accordingly, we reverse.

\* \* \* \* \* \*

The General Counsel also charged a unilateral change in Horvath's wage rates, beginning November 17, 1983. The claim of a unilateral wage rate change was first made in the union's Second Amended Charge, filed October 24, 1984, more than eleven months after the alleged underpayment began and eight months after it necessarily ended—for Horvath quit in February 1984. Section 10(b) of the Act, 29 U.S.C. § 160(b), forbids any complaint "based upon an unfair labor practice occurring more than six months prior to the filing of the charge with the Board". The Board seeks to counter § 10(b)'s time bar with the doctrine of relation back, arguing that the Horvath wage claim is "closely related" to the audit claim, which was filed May 16, 1984. See, e.g., *G.W. Galloway Co. v. NLRB,* 856 F.2d 275, 279–80 (D.C.Cir.1988); *NLRB v. Complas Industries, Inc.,* 714 F.2d 729, 733 (7th Cir.1983). The Board found a close relation between the claims because of its theory that the purpose of the union's inspection request was to determine Horvath's wage rates. *NLRB Decision,* slip op. at 11–12.

But since there was little or no evidence supporting the Board's inference that the company knew the audit request was related to Horvath's pay—certainly not substantial evidence—the relation is far from close. A violation of the union's right to an audit for the fringe benefit funds has nothing to do with underpayment of wages. As the history of the audit dispute in fact did *not* put the Wilsons on notice of a connection to

the Horvath wage claim, and as the May 16, 1983 charge itself forged no such link, the audit claim was inadequate to afford the company notice that anything relating to Horvath's wages was at issue. See *Land Air Delivery, Inc. v. NLRB,* 862 F.2d 354, 360 (D.C.Cir.1988) ("when the Board ventures outside the strict confines of the charge, it must limit itself to matters sharing a significant factual affiliation with the activity alleged in the charge") (quoting *G.W. Galloway Co.,* 856 F.2d at 280).

\*　　\*　　\*　　\*　　\*　　\*

Accordingly, we grant the petition for review and deny the cross petition for enforcement.

*It is so ordered.*