## REEBIE STORAGE AND MOVING COMPANY, INCORPORATED, Petitioner/Cross–Respondent,

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.

Nos. 93–4060, 94–1225.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 24, 1994.

Decided Jan. 12, 1995.

---

Edward B. Miller, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL (argued), for Reebie Storage and Moving Co., Inc.

David Silverman, N.L.R.B., Contempt Litigation Branch, Washington, DC, Elizabeth Kinney, N.L.R.B., Region 13, Chicago, IL, Aileen A. Armstrong, Howard E. Perlstein, Margaret Gaines Neigus (argued), Nancy B. Hunt, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, for N.L.R.B.

Thomas R. Carpenter, Peggy A. Hillman, International Brotherhood of Teamsters, Local 705, Chicago, IL, for Truck Drivers, Oil Drivers, Filling Station and Platform Workers' Union Local 705.

Before POSNER, Chief Judge, BAUER, Circuit Judge, and WILL,* District Judge.

BAUER, Circuit Judge.

Reebie Storage and Moving appeals from a decision rendered by the National Labor Relations Board ("Board") holding that Reebie had applied its contract on a "members-only" basis in violation of section 8(a)(3) of the National Labor Relations Act ("Act"). 29 U.S.C. § 158(a)(3). We find that the allegation in the complaint upon which this finding was based was not closely related to any of the allegations contained in the initial charge and should have been stricken. Reebie's petition for review of the Board's decision is therefore granted, and the General Counsel's petition for enforcement is denied.

Reebie engages in the moving and storage of commercial and household goods and has its main facilities in Franklin Park, Illinois. Depending on the demands of the season, Reebie has employed somewhere between 4 and 100 workers at that location. For many years, the union of Truck Drivers, Oil Drivers, Filling Station and Platform Workers, Local No. 705 ("Union") represented several of Reebie's workers. Reebie, in turn, belonged to the Movers' Association of Greater Chicago ("Association"), a confederation of local movers which collectively represented its members in negotiating and drafting labor

---

* The Honorable Hubert L. Will, United States District Judge for the Northern District of Illinois, is sitting by designation.

agreements with the Union. The agreement between the Union and the Association relevant to this case ran from March of 1987 to March of 1990. Included in this agreement was a "favored nations clause" which entitled Reebie to the benefits of any subsequent contract entered into by the Union if the subsequent contract included terms more favorable than those in Reebie's agreement. The agreement also included a "union security clause" which required all employees performing designated unit work to become members of the Union within thirty days of employment.

Despite this latter requirement, Reebie operated for the course of the agreement with only twelve of the approximately thirty unit members as part of the Union. Because only employees covered by the contract were entitled to welfare and pension benefits, Reebie avoided making contributions on behalf of the non-union employees. Acknowledging that Reebie was not as large as other employers within the Association and therefore could not viably provide contract coverage to all of its employees, Dan Ligurotis, the Union's Secretary–Treasurer, acquiesced in this arrangement on the Union's behalf and no grievances were filed against Reebie. But in July of 1989, apparently unaware of Ligurotis's agreement, union representatives William Dicks and Gerald Rzewnicki visited Reebie's Franklin Park facility and signed up as union members between twenty and twenty-five Reebie employees. Their intent was for these workers to receive contract coverage, but that never occurred.

As the agreement neared expiration and negotiations for a new agreement were underway, the Union sent Reebie the following request:

> In order to determine compliance with the contract, please forward as soon as possible, a weekly list from the first week of September, 1989 through the last week in January 1990, showing names, addresses, rates of pay, and hours worked per day for *all* employees performing any movers work. The list should be broken down between regular employees and all other employees—excluding summer replacements.

Salvatore Manso, Reebie's president, responded to the letter first by noting that under the "favored nations clause," Reebie was entitled to see any contracts into which the Union had entered that contained terms more favorable than those in Reebie's contract. Manso suggested that the parties get together and exchange the requested information, but when the Union neglected to pursue this matter further, Manso assumed the issue had been dropped.

Relations between Reebie and the Union reached their most bitter point on March 21, 1990, when frustrated by failed attempts to reach a new agreement, Reebie finally declared an impasse in negotiations. On the following morning, Manso called a meeting of his staff and announced his intention to unilaterally implement as the new terms of employment the terms of Reebie's final offer to the Union. He informed his employees that if they chose to strike in protest, Reebie was legally permitted to replace them permanently. Manso also told unionized employees that if a strike was called and those employees continued to work, they would be subject to discipline from the Union.

Based on the foregoing events, the Union filed a charge with the Board claiming that by Manso's words and actions, Reebie had attempted to discourage employees from belonging to the Union in violation of section 8(a)(3) of the Act. The charge also claimed that by failing to furnish the information requested, Reebie had violated its duty to bargain under section 8(a)(5). Upon an investigation, the Board's General Counsel issued a complaint alleging that Reebie: (1) discouraged its employees from affiliating with the Union by threatening them with discharge and by conditioning their continued employment on resignation from the Union; (2) failed to provide the Union with requested information; and (3) encouraged union membership by applying the terms and conditions of the agreement to union employees only.[1]

---

1. Paragraph VII of the complaint claims that the effect of the members-only practice was to "dis-courage" union membership. The General Counsel claims that this was a mistake and that

The case was presented to an Administrative Law Judge ("ALJ"), who held first that the evidence failed to establish that Reebie had done anything to discourage its employees from belonging to the Union. The ALJ also held that by failing to respond to Manso's suggestion that each side exchange the requested information, the Union had dropped its request for information. On the complaint's third allegation, however, the ALJ ruled in favor of the Union, reasoning that although "members-only" agreements were not per se illegal, not offering similar terms to non-Union workers was unlawful conduct. In a 2-to-1 decision, the Board affirmed. The Board's dissenting member believed that the third allegation should have been stricken from the complaint because it was not closely related to the original charge. Reebie asks us to reverse the Board's decision either on the grounds set forth in the Board's dissent or because the decision was unsupported by substantial evidence. Because we find that the allegation of pro-union discrimination was not sufficiently related to the conduct initially complained of by the Union, we need not evaluate the evidentiary basis of the Board's decision.

■ Allegations of unfair labor practices are acted upon only after a two-step process is satisfied. A party must first file with the Board's General Counsel a charge setting forth its allegations. Then, if the General Counsel decides that the allegations in the charge are worthy of prosecution, it will issue a complaint against the alleged wrongdoer and the case will be argued before an ALJ. In drafting the complaint, the General Counsel is substantively limited by the contents of the original charge. Though it need not be a verbatim restatement, the complaint must be "closely related" to the charge. The scope of the permissible variance between the charge and the complaint is at issue in this case.

■ In *NLRB v. Fant Milling,* 360 U.S. 301, 307–08, 79 S.Ct. 1179, 1183–84, 3 L.Ed.2d 1243 (1959), the Supreme Court noted that because the role of the General Counsel is to vindicate public rights, the General Counsel should be permitted to amend the allegations in the charge based on information it obtains during its investigation. Our interpretation of this rule has been quite deferential to the General Counsel. *See, e.g., NLRB v. Braswell Motor Freight Lines, Inc.,* 486 F.2d 743, 746 (7th Cir.1973) (stating "so long as the Board entered the controversy pursuant to a formal charge it may allege whatever it finds as part of that controversy."). Nevertheless, because the General Counsel is not vested with the authority to investigate labor practices on its own initiative, if the complaint includes allegations which are completely outside of the situation complained of in the charge, those allegations must be stricken. *NLRB v. Complas Indus., Inc.,* 714 F.2d 729, 732 & n. 3 (7th Cir.1983).

■ Critical to a determination of whether allegations in a complaint are closely related to those in the charge is a comparison of the legal and factual bases of the allegations. *Redd–I, Inc.,* 290 NLRB 1115, 1116 (1988). In comparing the legal similarity, we consider whether the new allegations are of the same class as the violations complained of in the charge. Relevant to this inquiry is whether the new allegations involve the same legal theory and the same section of the Act. *Id.* at 1118. The second inquiry is whether the new allegations arise from the same factual situation as those contained in the charge. *Id.* Applying this test, we fail to find a sufficient nexus between the charge's allegations and the complaint's allegation that Reebie discriminated against non-Union employees.

■ There is, in this case, an obvious tension between the charge and the complaint. The charge complains of several practices occurring upon expiration of the agreement, all of which are alleged to have been designed to discourage Union membership. The complaint on the other hand, after incorporating the claims of the charge, adds that in administering the contract, Reebie unfairly excluded certain employees from the contract's coverage because they were not Union

the complaint should instead have characterized the effect of the practice as "encouraging" union membership. We agree with the Board in finding that this error was evident and that Reebie was not prejudiced by the error. We proceed, therefore, as if the complaint read as intended.

members. In other words, the complaint accuses Reebie of both encouraging and discouraging Union membership. Because the charge was limited to complaints of anti-union conduct, Reebie contends that the new pro-union allegation cannot be considered "closely related" to the charge.

At oral argument, counsel for the Board argued that even though the charge and complaint allege conduct diametrically opposed in motivation, they could be reconciled on a more general level because each presented an instance of discriminatory conduct. But at certain levels of legal abstraction, any two allegations are capable of being deemed "related." Such a generous interpretation would improperly provide the General Counsel with carte blanche to amend the charge as it pleases. *Fant Milling*, 360 U.S. at 309, 79 S.Ct. at 1184. Anchoring the General Counsel's inquiry is the underlying fact situation. To prevent the General Counsel from engaging in an unprincipled enlargement of the charge, the complaint's allegations must be true to the factual situation addressed in the charge. And, as the Board noted in its opinion, the complaint's allegation of union favoritism is factually distant not only in nature but also in time from the charges of anti-union conduct.

■ Perhaps in recognition of this disparity, the General Counsel, in the alternative, defends the decision below on the grounds that the allegation of union favoritism stemmed from the charge's "refusal to provide information" claim. Echoing the reasoning employed by the ALJ, the General Counsel states that the purpose for the request is intertwined with the request itself, and because the Union's intent in requesting the information was to determine whether Reebie was applying the terms of its contract on a "members-only" basis, the request for information was factually related to Reebie's discrimination in favor of the Union.

The Court of Appeals for the D.C. Circuit rejected a similar argument in *Wilson & Sons Heating & Plumbing, Inc. v. NLRB*, 971 F.2d 758 (D.C.Cir.1992). The court's decision reversed an order of the Board which had held that an allegation in a complaint accusing the employer of unilaterally changing the wage rates specified in the collective bargaining agreement was closely related to a charge alleging a refusal to furnish the union with requested information. *Id.* at 763. Both allegations stemmed from purported violations of the employer's bargaining obligations under section 8(a)(5) of the Act. The Board had concluded that because the purpose of the request was to confirm that the employer had deviated from paying the wage rates specified in the agreement, the two allegations were factually related. The court of appeals found, however, that this link was supported by less than substantial evidence and reversed the Board's determination.

Careful scrutiny of this case reveals that the relationship between the allegations in this case are even more tenuous than the relationship which existed in *Wilson & Sons*. First of all, the two allegations in this case rest on different statutory provisions and different legal theories; these differences render the legal similarity between the two allegations more dubious. At least in *Wilson & Sons*, the union's duty of representation was a legal issue common to both allegations.

More importantly, there is no evidence to justify the Board's anomalous finding that the Union was requesting information so that it could uncover practices which benefitted Union members. A request for data pertaining to the terms of employment of all unit workers is not inherently related—and certainly not closely related—to an allegation of discrimination in favor of the Union. And without any evidence to suggest that Reebie was aware of the connection, this argument, as in *Wilson & Sons*, must fail.

Instead, the evidence consistently paints a picture of a union concerned only about the treatment of its own members. As the ALJ found, the Union was content in its arrangement with Reebie which provided coverage for members only, and it did not attempt to act on behalf of non-union workers. In fact, one of the stumbling blocks to a new agreement was the Union's insistence that its members be guaranteed a more favorable benefits package than non-members.

Consistent with this course of conduct, it appears that the request, coming on the heels of the Union's discovery that Reebie was not making the appropriate union contributions for the new members signed up in July of 1989, resulted from concern about Reebie's treatment of these new Union members and not from any concern over the terms which Reebie was providing to its non-union employees. Suspicious that Reebie was misapplying the contract among its own members, the Union requested the information so that it could confirm this belief. That the Union requested information dating back only to September of 1989 reinforces this conclusion. Aware that the contract had been applied on a members-only basis since 1987, the Union nevertheless limited its request to the period in which most unit workers had already signed up as new members. Had the Union been acting on behalf of non-members, it would have solicited data from the period before the new members had signed up. Hence, the only supported inference pertaining to the Union's intent is that the request was simply another example of the Union's exclusive concern for its membership and was designed to confirm that the new Union members were not receiving contract coverage.

By our holding, we do not mean to comment on whether the arrangement between Reebie and the Union was lawful. We find merely that in including in the complaint the allegation that Reebie applied its contract on a "members-only" basis, the General Counsel strayed beyond the conduct complained of in the charge and was in essence acting on its own initiative. Because the Union's charge took exception to conduct directed at its members and did not contemplate non-members, the allegation claiming discrimination against non-members should have been stricken. In accordance with the foregoing, we grant Reebie's petition for review and deny the General Counsel's cross-petition for enforcement.

WILL, District Judge, dissenting.

With regret, I dissent. The facts in this case clearly call for the relief which the ALJ and the Board ordered and which the court now reverses and vacates.

As the opinion points out, Reebie was and is a member of the Movers' Association of Chicago which had a master contract with Local 705. The union security clause of that contract required that all employees performing designated unit work be members of the union and receive the contract benefits including vacation, health, welfare and pension benefits.

Notwithstanding, for a number of years, only twelve of the approximately thirty Reebie unit employees were recognized by Reebie to be union members even though, at one time, between twenty and twenty-five of them signed up to be members. Apparently, the arrangement by which only a minority of the eligible employees became recognized union members and received the contract benefits, was a private one between the Union's secretary-treasurer and Reebie's president. As a result, less than half of the eligible Reebie employees became recognized union members and received benefits although no grievances were filed against Reebie by the union.

The contract between the Association, Reebie and Local 705 was scheduled to expire in March 1990. Reebie and the union began negotiating a new contract among themselves, the union now seeking to represent all unit employees and Reebie asserting, as it had in the past, that it could not afford to provide contract coverage and benefits to all of its unit employees.

On March 22, 1990, Reebie informed its employees that the negotiations had reached an impasse and that the company intended to operate on the basis of its latest and final offer to the union. It also advised the employees that if a strike was called, any striking employees would be permanently replaced.

The union then filed a charge with the Board alleging: (1) that Reebie had attempted to discourage employees from joining the union in violation of section 8(a)(3) of the Act; and (2) that Reebie, in failing to furnish information requested by the union, had refused to bargain in good faith and had violat-

ed section 8(a)(5) of the Act. After an investigation of the charges, the Board's General Counsel issued a complaint alleging that Reebie had: (1) discouraged its employees from joining the union by threatening them with discharge if they did and conditioning their future employment on resignation from the union; (2) failed to provide the union with information which it needed for collective bargaining negotiations; and (3) applied the terms and conditions of the contract to union members only and thereby encouraged union membership although making clear that it could not afford to have all eligible unit members be union members.

The majority holds that the third ground, the only one on which the ALJ and the Board found for the union, was not sufficiently related to the grounds in the union's original charge to permit the General Counsel to assert it in his complaint.

As the majority opinion points out, there have been a number of decisions discussing under what circumstances the General Counsel may modify or amend a charge in filing a complaint. It is accurate, I believe, to say that there is no easy or bright line of demarcation. In *NLRB v. Fant Milling Company,* 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959), as the majority points out, the Supreme Court specifically noted that, because the role of the General Counsel is to vindicate public rights, he should have and has the right to amend the allegations in a charge to reflect the information obtained as a result of his investigation. This court, as the majority also points out, has heretofore been quite deferential to the General Counsel's discretion saying in *NLRB v. Braswell Motor Freight Lines, Inc.,* 486 F.2d 743, 746 (7th Cir.1973), that "so long as the Board entered the controversy pursuant to a formal charge, it may allege whatever it finds as part of that controversy." The exception to that rule was only that the complaint may not contain allegations which are ".so completely outside of the situation which gave rise to the charge that it may be said to be initiating the proceeding on its own motion,...." *NLRB v. Kohler Co.,* 220 F.2d 3, 7 (7th Cir.1955), quoted in *NLRB v. Complas Industries, Inc.,* 714 F.2d 729, 733 n. 3 (7th Cir.1983).

The General Counsel and the Board may allege violations not included in the original charge if the violations did not occur more than six months prior to the filing and service of the charge, and if the new violations are closely related to the violations contained in the charge. *See Complas,* 714 F.2d 729, 733 (7th Cir.1983), citing *Indiana Metal Products Corp. v. NLRB,* 202 F.2d 613, 619 (7th Cir.1953). Yet, even while requiring that the charge and the complaint be "closely related," the court in *Complas* used the standards articulated in *Fant Milling* and *Kohler,* ·described above, to determine whether the complaint was closely related to the charge.

The Board has developed a slightly more restrictive test to determine if the complaint is related to the charge. As the majority points out, the Board looks to see if the allegations involve the same legal theory, if the allegations arise from the same factual situation or sequence of events, and if the respondent would raise the same or similar defenses to both allegations. *Redd–I, Inc.,* 290 N.L.R.B. 1115, 1116 (1988). While the Supreme Court has not recognized the *Redd–I* test, under *Chevron USA, Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694· (1984), we are obligated to accept an agency's construction of a statutory provision if that construction is reasonable.

The problem here, however, is that the Board specifically recognized and applied its *Redd–I* test in this case and found that the complaint and the charge were "closely related." The Board's findings and. conclusions are entitled to deference from the reviewing court if they are supported by substantial evidence in the record as a whole, even if the court could justifiably have made a different choice judging the matter de novo. *Universal Camera Co. v. NLRB,* 340 U.S. 474, 487–88, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). As will appear, I believe that, not only is its finding supported by substantial evidence, but that the Board was. right.

The union had requested information regarding "*all* employees performing any movers work." (emphasis in original). As the Board noted in its decision, the employer

understood this request to refer to all members of the bargaining unit, not just union members. *See* 313 N.L.R.B. No. 58, p. 2 n. 5. The Board concluded that the General Counsel, upon investigating the charge that the employer had refused to provide information concerning compliance with the contract, learned that, consistent with the union's basis for requesting the information, the employer was not applying the contract to all unit members. The dissenting Board member thought that the record established that the union had requested the information because it discovered that the contract was not being applied to new union members, while the majority thought that the evidence established that the union requested the information because the employer had not applied the contract to all members of the bargaining unit.

Even if we were to accept the conclusion of the dissenting Board member, the Board clearly "entered the controversy pursuant to a formal charge." That charge alleged that the employer failed to provide information to the union, and the information which it failed to provide concerned the wages and hours of the employees in the bargaining unit. Even if the charge had been brought because of the employer's failure to apply the contract to union members, a cursory investigation by the General Counsel would have uncovered the discrimination against nonunion members as well.

In support of its conclusion that the complaint was sufficiently related to the charged conduct, the Board quoted at length from *Fant Milling*. That quote is worth repeating here:

A charge filed with the Labor Board is *not to be measured by the standards applicable to a pleading in a private lawsuit.* Its purpose is merely to set in motion the machinery of an inquiry. *NLRB v. I. & M. Electric Co.,* 318 U.S. 9, 18, 63 S.Ct. 394, 400, 87 L.Ed. 579. The responsibility of making that inquiry, and of framing the issues in the case is one that Congress has imposed upon the Board, not the charging party. To confine the Board in its inquiry and in framing the complaint to the specific matters alleged in the charge would

reduce the statutory machinery to a vehicle for the vindication of private rights. This would be alien to the basic purpose of the Act. . . .

*Once its jurisdiction is invoked the Board must be left free to make full inquiry under its broad investigatory power in order properly to discharge the duty of protecting public rights which Congress has imposed upon it. There can be no justification for confining such an inquiry to the precise particularizations of a charge.* (Emphasis supplied)

313 N.L.R.B. no. 58, p. 2, quoting *NLRB v. Fant Milling Co.,* 360 U.S. 301, 307–08, 79 S.Ct. 1179, 1183–84, 3 L.Ed.2d 1243 (1959). The Board then noted that, while it does not have "carte blanche to expand the charge" as it might please, Section 10(b) only requires "that there be a 'sufficient relationship between charge and complaint "to negate the possibility that the Board is proceeding on its own initiative rather than pursuant to a charge." ' " 313 N.L.R.B. no. 58, p. 2, quoting *Speco Corp.,* 298 NLRB 439, 440 (1990), citing *NLRB v. Central Power & Light Co.,* 425 F.2d 1318, 1321 (5th Cir.1970).

The majority here does not find, nor do I believe that it could, that the complaint was so completely outside of the situation which gave rise to the charge that it constituted the initiation of a new and different proceedings. Clearly, what happened here was that in the course of investigating the union's charge, the General Counsel discovered the more complex and invidious course of Reebie's and the union's conduct. He then proceeded to file a complaint based on the facts disclosed by his investigation.

The majority holds that the current test of the General Counsel's discretion is whether the complaint is "closely related" to the charge, whether the allegations of the complaint arise from the same facts and involve the same legal theory and sections of the Act and whether the employer had knowledge of the issue in question. Applying that test, the majority finds that they do not, although they clearly arise from the same facts and, as unfair labor practices, involve violations of the same sections of the Act. Under the current test, I believe that the complaint, as

the Board found, clearly qualifies as "closely related" to the charge.

The evidence presented to the Board indicated that the union had requested the information on all the bargaining unit members' wages and hours because it believed that the employer was not applying the contract to all of the bargaining unit employees. The General Counsel, making a "full inquiry under its broad investigatory power in order properly to discharge the duty of protecting public rights," *Fant Milling*, 360 U.S. at 308, 79 S.Ct. at 1183, determined that the employer was discriminating against nonunion employees.

It is for this reason that *Wilson & Sons Heating & Plumbing, Inc. v. NLRB*, 971 F.2d 758 (D.C.Cir.1992), cited by the majority, is not analogous to this case. The facts and grounds there are quite different than those here. In *Wilson & Sons*, the Board found that the employer violated the Act by refusing to comply with a union request to audit the company's books, information which the Board understood was requested in order to verify one employee's wages. The court of appeals reversed, finding that the Board's conclusion that a relationship existed between the audit request and the one employee's wage information was unsupported by the record. Once the court determined that no relationship existed, it concluded that a charge brought by the General Counsel of a unilateral change in the particular employee's wages, which was time barred under § 10(b) unless it related back to the union's charge, was not closely related to the audit request, and therefore could not relate back. Here, there was never a question that the information request was related to the unit employees' wage and hour information. Instead, based on the complaint that the General Counsel brought once he investigated the failure to supply the information, the ALJ and the Board found that Reebie had violated the Act by applying the terms of the contract only to those employees it recognized as union members and not to those it did not recognize even though they had signed union membership cards and were performing the same unit work.

The majority here relies on *Wilson* to inject a new element into the "closely related" test: i.e., whether the complaint reflects the charging party's intent and whether the employer had knowledge of that intent. The majority states that "[a] request for data pertaining to the terms of employment of all unit workers is not inherently related—and certainly not closely related—to an allegation of discrimination in favor of the union. And without any evidence to suggest that Reebie was aware of the connection, this argument, as in *Wilson & Sons*, must fail." With all due respect, Reebie was well aware that the union was seeking information in connection with its efforts to have all unit employees become union members and receive the benefits of the contract. That precise issue was what had caused Reebie to declare the negotiations on a new contract at an impasse and refuse to bargain further and which caused the union to file its charge. It is inconceivable that Reebie didn't know why the union sought the information here.

In *Wilson & Sons*, the audit request issue was arguably relevant to whether the employer's failure to provide audit information violated its duty to bargain. The court found that the employer did not violate its duty to bargain by failing to provide the information because it did not know that the purpose for the request was to obtain information relevant to the bargaining negotiations, i.e., wage rates. That clearly is not the case here. Reebie knew very well that the information related to the only issue in the case, the disparate treatment of some unit members.

Prior to this case, we have not required that the employer be made aware by the charge of the specific violations eventually included in the complaint, only that these violations be closely related to the charged conduct. This new requirement is unprecedented, and, I believe, in direct contradiction with the holding of *Fant Milling*. It is totally inconsistent with the breadth of General Counsel and Board discretion defined in that and succeeding cases. Moreover, as previously indicated, the last thing Reebie could seriously contend here is that it was unaware of the sole issue in the case, the difference in

**614**

treatment between union and non-union employees performing the same work.

The Board correctly concluded that the General Counsel had not proceeded on his own initiative, but rather as a direct result of his investigation of the charge. The majority, by reading the "closely related" requirement more narrowly than intended by the Supreme Court in *Fant Milling* or in any of the succeeding cases including *Redd–I* and *Wilson & Sons,* substantially proscribes the Board's authority to protect employees' rights.

It applies a highly technical standard which is reminiscent of the days of common law pleading and which is clearly inconsistent with the holding in *Fant Milling* and later cases that the General Counsel and the Board, in order to carry out their duty to vindicate public rights, have discretion to amend the allegations of a charge to reflect the information obtained in the course of their investigation so long as it cannot be said that it constitutes initiating a new proceeding on their own motion.

What the majority does here, applying this highly technical standard, is to prevent the Board from vindicating the rights of those employees who, despite a collective bargaining agreement establishing the terms of their employment, found themselves deprived of the benefits thereof by their employer.

The majority apparently recognizes that the situation at Reebie may well violate the National Labor Relations Act when it says, maj. op. page 610, that it does "not mean to comment on whether the arrangement between Reebie and the Union was lawful." Depriving more than half of the eligible employees of their right to join the union and to obtain the benefits under the contract to which they would be entitled most certainly is inconsistent with the Act. To remedy that situation, the Board entered its order requiring the company to permit all eligible employees to exercise their rights to be recognized as union members and to make whole all eligible non-union employees for any loss of wages, health and welfare, pension, vacation or other benefits they would have received as union employees.

The majority now erroneously denies enforcement of that order thereby depriving a substantial majority of the Reebie employees of the benefits to which they are entitled and relegating them to start all over in their efforts to secure their rights under the Act. I therefore dissent.