**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 10 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NATIONAL LABOR RELATIONS
BOARD,

     Petitioner,

v.

OKLAHOMA FIXTURE COMPANY;
OKLAHOMA INSTALLATION
COMPANY,

     Respondents.

No. 01-9518
(National Labor Relations Board)
(No. 16-CA-16265)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, Circuit Judge, **McWILLIAMS** and **BRORBY**, Senior Circuit
Judges.

The National Labor Relations Board ("NLRB") seeks enforcement of its

order against Oklahoma Fixture Company ("OFC") and Oklahoma Installation

Company ("OIC") reported at 333 NLRB No. 95 (2001). In that order, the NLRB

determined OFC and OIC violated Sections 8(a)(5) and (1) of the Unfair Labor

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Act (29 U.S.C. § 158(a)(5) and (1)) by failing to abide by a collective bargaining agreement and refusing to provide the Carpenters District Council of North Central Texas, affiliated with United Brotherhood of Carpenters and Joiners of America, AFL-CIO ("the Union") with information relating to company labor practices in the Union's jurisdiction. We exercise jurisdiction under 29 U.S.C. § 160(e) and deny enforcement.

OFC contends the NLRB erred in concluding it was bound by a terminated master collective bargaining agreement it never signed, simply because it had signed a separate "me too" agreement[1] twenty years prior. It also maintains NLRB violated its due process rights by deciding the case on a theory not alleged in the complaint. If OFC was not contractually bound by a collective bargaining agreement with the Union, NLRB's finding of unfair labor practices cannot stand.

---

[1] "Me too" agreements allow smaller employers to obtain the benefits of the master collective bargaining agreement negotiated by the principal employers in the industry without bearing the burden and expense of such negotiations and without assigning their bargaining rights to a collective bargaining representative.

> Thus, the independent employer is assured that (1) it will not be subject to a contract containing more onerous conditions than are applicable to its competitors, (2) it will obtain whatever protections or advantages the industry collective bargaining agreement provides other employers, (3) it will be saved the cost of expensive negotiations, and . . . (4) it will be covered by an agreement whenever the rest of the industry is covered and not subject to an agreement whenever the rest of the industry is not.

*Arizona Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1518 (9th Cir. 1985).

## BACKGROUND

The facts are undisputed. OFC is an Oklahoma corporation that manufactures and installs fixtures and custom woodwork in retail stores throughout the United States. OIC, formed in May 1987, installs most of the fixtures manufactured by OFC. No appeal was taken from NLRB's finding that OIC was the alter ego of OFC. As OFC's alter ego, OIC is bound to OFC's "me-too" agreement to the same extent OFC is bound.

In July 1975, the North Texas Contractors Association ("NTCA") and the Union negotiated a collective bargaining agreement, effective July 30, 1975, through April 30, 1978 ("Master Agreement"). The Master Agreement was self-described as a contract between NTCA "on behalf of members who have assigned their bargaining rights" and the Union. On July 7, 1975, before the finalization of the Master Agreement, OFC signed a "me-too" agreement[2] with the Union,

---

[2] The "me-too" agreement, drafted by the Union, is a one page contract that states, in pertinent part, as follows:

> The Company, who has not given their [sic] bargaining rights to the North Texas Contractors Association, and the Union recognize the negotiated agreement between the North Texas Contractors Association and the Carpenters District Council of North Central Texas as the agreement between the Company and the Union. The parties agree to keep this agreement in full force and effect until an agreement has been reached between the negotiating parties.
> The Company agrees to pay the wages now in effect and also agrees to pay retroactive to May 1, 1975, the wages finally agreed upon in the negotiations going on at the present time. Then the terms and conditions of that agreement will be in effect.

consenting to be bound by the Master Agreement that would ultimately result from negotiations between the Union and NTCA. The "me-too" agreement specifically acknowledged that OFC did not assign its bargaining rights to NTCA. It focused on wages and benefit contributions but did not discuss duration or termination.

The Master Agreement contained a duration clause, stipulating that after April 30, 1978, it would become an annual contract that "either party" could terminate upon proper notice. Starting around April 30, 1978, NTCA and the Union negotiated several successive collective bargaining agreements that replaced the Master Agreement. NTCA terminated the last of these successive agreements on April 30, 1984. It thereafter negotiated an entirely new agreement with the Union, effective August 23, 1984.[3] A new "me-too" agreement was never obtained from OFC.

From July 1975 through 1985, OFC employed workers within the Union's jurisdiction and made payments to the Union's health and welfare pension programs at the rate provided by the Master Agreement and successor agreements.

_____

(Wages and benefits are then listed.) (R., tab 7, ex. 11.)

[3]The record is unclear whether the Master Agreement was terminated in 1978, upon the Union and NTCA negotiating and entering into successor agreements, or in 1984 when one of these successor agreements was terminated. Regardless, it appears the Master Agreement was terminated before 1987, when OIC began performing work in the Union's jurisdiction.

OFC performed no work in the jurisdiction from 1985 to 1995, and thus had no obligation to make Union payments. After resuming work in the jurisdiction in 1995, OFC, under protest that it was not legally obligated to do so, continued payments to the Union. OIC has performed work in the Union's jurisdiction since its creation in May 1987, but neither OIC nor OFC informed the Union of OIC's activities or made payments to the Union on behalf of OIC. In May 1993, the Union requested information from OFC regarding its relationship with OIC. OFC did not provide the requested information. Thereafter, the Union filed a charge with NLRB against OFC alleging violations of the National Labor Relations Act. NLRB's General Counsel investigated and issued a complaint, specifically asserting that OFC, and OIC as its alter ego, were bound by all successor contracts negotiated between the Union and NTCA.[4] The Union similarly asserted in letters and briefs that OFC and OIC were bound by the successor agreements because of the automatic renewal clause in the Master Agreement. OFC responded to this specific allegation contained in the General Counsel's complaint and in the Union's briefs.

---

[4] The complaint, submitted by NLRB's general counsel, alleged OFC "agreed to be bound by a collective bargaining agreement between the Union and [NTCA], effective May 1, 1973, through April 30, 1975, and to be bound by *future agreements* negotiated between the Union and NTCA." (Emphasis added). The complaint did not allege OFC was still bound by the Master Agreement that was no longer in effect for its signatories.

Since the facts relating to that allegation (OFC & OIC were bound to successor agreements) were not in dispute, the parties waived a trial before an administrative law judge and submitted the case on stipulated facts directly to the NLRB. A two-to-one majority of the NLRB held the "me-too" agreement did not bind OFC to the successor agreements.[5] Instead, the NLRB majority, sua sponte and inexplicably, decided OFC's obligations continued under the Master Agreement even though it was terminated between NTCA and the Union, at the latest in 1984.

## DISCUSSION

A. Master Agreement

We generally afford "great weight" to NLRB's legal determinations and uphold those within reasonable bounds. *National Labor Relations Bd. v. Oklahoma Fixture Co.*, 295 F.3d 1143, 1145 (10th Cir. 2002)(quoting *National Labor Relations Bd. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993)). However, we review de novo NLRB's contract interpretations. *See Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 203 (1991).

The issue before us—whether signing a "me-too" agreement perpetually binds an employer to a terminated master agreement, which it did not sign—is a

_____

[5]No appeal was taken from that holding.

-6-

question of first impression in this Court. At least two other circuits have addressed this issue, and we find their decisions instructive. *See Wilson & Sons Heating & Plumbing, Inc. v. National Labor Relations Bd.*, 971 F.2d 758 (D.C. Cir. 1992); *C.E.K. Indus. Mech. Contractors, Inc. v. NLRB*, 921 F.2d 350 (1st Cir. 1990).

*Wilson* is the most compelling because its facts are similar to those before us. There, the company agreed to be bound by current master agreements between a union and a multi-employer association by signing annual letters of assent, similar to a "me-too" agreement, but never assigned its bargaining rights to the association. *Wilson*, 971 F.2d at 759. The master agreement was linguistically ambiguous as to whether it applied only to its signatories or if it also encompassed those signing letters of assent. *Id*. at 761. The letter of assent further confused the issue because it bound the company not only to the master agreement, but also to any revisions or amendments. *Id.* at 760. The master agreements stipulated they would automatically renew each year, absent proper notice to terminate. *Id.* At the end of the term of one of these master agreements, the multi-employer association prevented automatic renewal by giving notice of termination; it then negotiated a new agreement. Because the company that signed the letter of assent did not give notice of intent to terminate the agreement, the NLRB held the company was bound by the master agreement for another year,

even though that master agreement was no longer binding on its signatories, i.e., the union and the members of the multi-employer association. *Id*.

Reviewing the contract de novo, as instructed by *Litton*, the court refused to enforce NLRB's order, holding the master agreement's automatic renewal clause and notice requirement applied only to the master agreement signatories, not to those who signed letters of assent. *Id*. Further, the court concluded the automatic renewal clause could not bind the company to another term because the union and multi-employer association had terminated the master agreement and renegotiated a different contract. "It would surely be anomalous to bind the company to the terms of an agreement that no longer existed." *Id*. Although the court considered "this structural anomaly may well be enough" to find in favor of the employer, the court also looked at extrinsic evidence of intent due to the master agreement and letter of assent's "linguistic ambiguity." *Id*. at 761. Of significance to the court was the company's refusal to sign the new contract, even though it abided by the wage rates and benefit terms contained in it. *Id*. Additionally, the union originally told the company it was not bound by the new master agreement. *Id*.

Here, similar to *Wilson*, the Master Agreement had been terminated by its signatories. Like the D.C. Circuit, we conclude the "structural anomaly" of attempting to bind OFC to a terminated agreement is not justified by contract language in the "me-too" agreement.

We need not examine extrinsic facts because neither the Master Agreement nor the "me-too" agreement is ambiguous as to duration. Although the Master Agreement's duration clause did not define the phrase "either party," its introduction clearly stated it was an agreement between the Union and NTCA members. OFC was not an NTCA member and it did not assign its bargaining rights to NTCA; thus, it was not a party to the 1975 Master Agreement. The "me too" agreement refers to the Master Agreement and no other. It contains no language even remotely suggesting it has vitality independent of the Master Agreement. Whether it bound OFC to amendments, revisions, or successor agreements seems unlikely, but could possibly be debatable.[6] Neither ambiguous nor debatable is the effect of the 1984 termination. When the Master Agreement was terminated (whether unilaterally by NTCA or by the parties' mutual agreement), OFC's "me too" obligations, whatever they were, dissolved. The point of contract interpretation is to give meaning to the parties' express intention at the inception of their agreement, not to further one of the parties' unilateral interests, post hoc. We reject as irrelevant the argument that OFC did not expressly terminate its "me too" obligations by giving proper notice as prescribed

---

[6]For years following the 1975 Master Agreement, OFC paid wages and pension contributions at the rate provided in the successor agreements, which were in excess of those listed in the Master Agreement. The union accepted the higher payments. Even if debatable, it is of no practical significance since the NLRB determined OFC was not bound by the successor agreements.

in the Master Agreement (a point disputed by OFC). It strikes us as patently hollow and singularly unnecessary to give notice that one no longer considers itself bound to a terminated agreement.

In determining OFC was bound by the Master Agreement until it formally gave notice to terminate, NLRB relied upon *C.E.K.* That reliance is untenable. In *C.E.K.* it appears the court did not review the contract de novo as the Supreme Court later required.[7] *See Litton*, 501 U.S. at 202-03. Moreover, the facts are dissimilar. In *C.E.K.*, the employer signed the actual master agreement, not merely a "me-too" agreement. *C.E.K.*, 921 F.2d at 352.

In other cases where courts found the employer to be bound by automatic renewal clauses or new agreements, the employer signed a collective bargaining agreement consenting to be bound by successor agreements and failed to give the requisite notice of termination,[8] the employer signed a letter of assent that contained specific termination requirements that the employer did not follow,[9] the

---

[7]The court seemed to defer to NLRB's interpretation, saying, "[w]e find, however, that even under a less deferential posture, the Board's analysis of the contract is reasonable and supported by the evidence. Therefore, we agree with the Board's conclusion that the Agreement remained in force with respect to CEK." *C.E.K.*, 921 F.2d at 356. Accepting NLRB's analysis, if reasonable and supported by the evidence, is deferential—not de novo—review.

[8]*Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600 (7th Cir. 2002).

[9]*Nelson Elec. v. National Labor Relations Bd.*, 638 F.2d 965 (6th Cir. 1989).

employer assigned its bargaining rights to a multi-employer association,[10] and the employer did not follow the requirements of the letter of assent by providing notice of termination of its assigned bargaining rights to the multi-employer association.[11]

We conclude "that the master agreement's renewal clause was not enough to bind [OFC] to another [term] under the circumstances." *Wilson*, 971 F.2d at 759. Because OFC was not bound by the Master Agreement, neither was its alter ego, OIC. Consequently we set aside NLRB's order.

## B. Due Process Violation

OFC maintains NLRB violated its due process rights by deciding the case on a legal theory not presented in the complaint. Because OFC has prevailed on the merits, it is unnecessary to reach that issue.

---

[10]*Local 257, Int'l Bhd. of Elec. Workers, AFL-CIO v. Grimm*, 786 F.2d 342 (8th Cir. 1986).

[11]*National Labor Relations Bd. v. Black*, 709 F.2d 939 (5th Cir. 1983).

**CONCLUSION**

Oklahoma Fixture Company is not bound by the terminated 1975 Master Agreement. Accordingly, we **DENY** enforcement of National Labor Relations Board's order of April 4, 2001.

**Entered by the Court:**

**TERRENCE L. O'BRIEN**
United States Circuit Judge